UNITED STATES of America, Appellee,

v.

**John H. WEIDMAN, Jr., Appellant.**

**No. 76–1110.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1977.

Decided March 31, 1978.

Robert B. Barnett, Harold Ungar, Aubrey M. Daniel, III and Edward B. Williams, Washington, D. C., Myron J. Hack, South Bend, Ind., for appellant.

Richard L. Kieser, U. S. Atty., South Bend, Ind., Frank J. Gray, Asst. U. S. Atty., Fort Wayne, Ind., Carmen M. Piasecki, Asst. U. S. Atty., Hammond, Ind., for appellee.

Before SPRECHER, BAUER, Circuit Judges, and CAMPBELL, Senior District Judge.*

BAUER, Circuit Judge.

On November 21, 1974, John H. Weidman, Jr., and twenty-one other individuals were indicted on thirty-two counts of mail fraud, four counts of perjury and one count of conspiracy. The indictment alleged that Weidman and other supervisory officials of the Walsh Construction Company had defrauded both Walsh and the Bethlehem Steel Corporation at a major steel mill construction project in Burns Harbor, Indiana. More specifically, the named individuals were charged with obtaining money, goods and services for their own benefit through fictitious work orders, false invoices, fraudulent purchase orders and inflated labor and equipment charges.

Through a variety of plea agreements, the indictment was dismissed as to twenty of the defendants, leaving only Weidman (the president of Walsh) and Thomas J. McGrath (a Walsh vice president) to stand trial. While McGrath was ultimately acquitted, Weidman was found guilty of fourteen counts of mail fraud and one count of conspiracy. From this conviction, and the lower court's subsequent denial of his motion for a new trial, Weidman now appeals.

I.

In the first of his two principal arguments on appeal, Weidman claims that the lower court improperly admitted evidence on the earlier schemes of Walsh supervisory officials—schemes which, in their essential details, bore a close resemblance to the alleged mail fraud offense at Burns Harbor.[1] It is Weidman's contention that this testimony had no evidentiary value, was highly prejudicial, and thus was not properly admissible as evidence of "prior similar acts."

In considering the claim, we begin by noting that evidence of prior similar acts cannot be used to show that the accused, by virtue of his character, was predisposed to commit the crime with which he is charged. But prior similar acts may be used to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Thus, this Court has held that evidence of similar acts is properly admissible for any of these purposes "unless its probative value is outweighed by its prejudicial effect." *United States v. Fearns*, 501 F.2d 486, 491 (7th Cir. 1974). "And the balancing of probative value against prejudice is, in the first instance, left to the sound discretion of

---

\* The Hon. William J. Campbell, United States District Court for the Northern District of Illinois, is sitting by designation.

1. Specifically, the prosecution introduced evidence of allegedly fraudulent activities by Walsh personnel in four earlier construction projects:
 1. a project for Bethlehem Steel at Sparrows Point, Maryland;
 2. three projects for National Steel subsidiaries:
 a. the Weirton, West Virginia project (completed sometime in the 1950's);

b. the Midwest Steel project (from 1959 to 1971);
 c. the Great Lakes project (begun in 1964). The testimony on one of the projects—the Sparrows Point project—was not offered by the government to implicate Weidman. Rather, it was offered only to show the existence of a fraudulent scheme. An instruction tendered by the defendant was given immediately after the Sparrows Point testimony to remind the jury that the evidence was not offered as to the state of mind of Weidman.

the trial judge." *United States v. Jones*, 438 F.2d 461, 465 (7th Cir. 1971).

■ The appellant argues, however, that the element of intent was merely a "formal issue" in the proceedings below. Emphasizing that his defense was based not on a claim of "accident" or "mistake" but on the broad denial that he had committed the charged acts, he insists that there was in fact no contest as to his state of mind. Therefore, he concludes, there was no evidentiary need for the testimony on prior similar acts which could justify its prejudicial effect.

To support his claim, Weidman relies heavily on *United States v. Fierson*, 419 F.2d 1020 (7th Cir. 1969). The crux of the *Fierson* decision lay in its holding that evidence of prior similar acts should not be admitted "to show willfulness and intent when . . . the accused does not, except for demanding an instruction on the requisite willfulness and intent, otherwise put that issue in dispute." *Id.* at 1023. The facts of the case, according to the Court,

> "did not raise even the slightest suggestion that Fierson did the physical act charged but without the requisite willfulness and intent. There was no suggestion of accident or mistake. The defendant simply said he did not commit the physical act charged. . . . If the defendant had admitted the above acts but defended on the theory that he was joking and really did not mean it, then the matter of his intent might be said to be in issue . . . .. But here the issue of willfulness and intent was not sharpened; it was not really in dispute."

*Id.* at 1023. Thus, concluding that the probative value of the similar act evidence could not outweigh the risk of prejudice, the Court found the admission of the evidence to be reversible error.

In the case at hand, however, the Government had a substantial need to produce evidence of Weidman's intent even though he had not "sharpened" the issue by claiming accident or mistake. For an essential element of the mail fraud offense—an element that the Government must prove beyond a reasonable doubt—is the defendant's specific intent to defraud. Thus, this Court has held that evidence of prior similar acts is "particularly appropriate where, as with mail fraud, criminal intent is an essential element of the crime charged." *United States v. Hutul*, 416 F.2d 607, 624 (7th Cir. 1969). In *United States v. Marine*, we noted that

> "proof of specific intent to defraud is an essential element of the offense here involved and . . . the Government [has] the burden of proving such specific intent beyond a reasonable doubt regardless of whether or not defendant, in his opening statement, asserted his innocence or culpability as to that issue."

413 F.2d 214, 216 (7th Cir. 1969).

So quite apart from the nature of Weidman's defense there was, on the issue of intent, a substantial need for the government's evidence on prior similar acts. But this was not the only ground on which the testimony was relevant; it also furnished evidence of a pre-existing design or scheme.[2] And the use of prior similar acts for this purpose is appropriate whenever the accused denies the very doing of the act charged:

> "When the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's design or plan to do it. This in turn may be evidenced by conduct of sundry sorts as well as by direct assertions of the design . . . .. The object here is not merely to negative an innocent intent at the time of the act charged, but to prove a pre-existing design system, plan or scheme, directed forward to the doing of that act."

2 Wigmore, *Evidence* § 304 at 202. See also *United States v. Fearns, supra* at 419. Thus, by showing that the earlier schemes "bore a singular strong resemblance to the pattern of the offense charged," *United States v. Jones*, 438 F.2d 461, 466 (7th Cir.

---

**2.** The Government's failure to state this additional ground for the admissibility of the evidence is no basis for reversal. *United States v. Juarez*, 561 F.2d 65 (7th Cir. 1977).

1971), the government established a pre-existing plan or design which, in turn, tended to show "the doing of the act designed." Wigmore, *supra* at 202.

In this connection, however, the appellant makes one additional claim, namely, that the similar act evidence was not properly admissible against him since there was no convincing proof that he was actively involved in all of the other fraudulent activities. At the very least, however, the Government's evidence did indicate that Weidman was well aware of the earlier schemes in all of their particulars;[3] and it is this element of knowledge that establishes the relevancy of the similar act evidence.[4] The purpose of such evidence, after all, at least on the issue of a pre-existing plan or scheme, is simply "to fix a design upon the defendant, as making it likely that he carried it out . . . ." Wigmore, *supra* at 204–205. This purpose was realized, it seems clear, when the Government showed that Weidman, by virtue of his knowledge of, or involvement in, the earlier schemes, was well acquainted with the modus operandi employed in the alleged mail fraud offense at Burns Harbor. By the same token, Weidman's knowledge of the earlier schemes served as the basis for their relevancy on the issue of intent.

We conclude, then, that on several grounds—intent, knowledge, design—there was substantial value in the testimony on other fraudulent activities involving Walsh supervisory officials. In this light, we cannot agree that the lower court abused its discretion in determining that the probative value of the evidence outweighed its prejudicial effect.

## II.

In the second of his two major arguments on appeal, Weidman insists that the district court erred in denying his motion for a new trial. This motion was based on a claim that he had been unfairly prejudiced by the Government's failure to provide information on Walter B. Cox, a major witness at trial and a central figure in the mail fraud scheme. More specifically, according to Weidman, the prosecution improperly withheld information on (1) discussions that were held in 1972 between Cox and the Government on a possible grant of full immunity; (2) the Government's alleged agreement to recommend that Cox not be fined for filing a false income tax return; and (3) Cox's alleged attempt to bribe an NLRB official. Following an evidentiary hearing on August 31, 1976, the district court found that none of the three "nondisclosures" operated to deprive the defendant of a fair trial. The lower court erred, Weidman now argues, on all three points.

The basis for Weidman's claim is found in the prosecution's constitutional obligation to disclose evidence in its possession that would be material to the defense of the accused. This obligation was firmly established by the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). But it was not

---

3. For example, witness Beutler, an auditor for National Steel, testified that a series of audits which he performed on work done by Walsh at the Weirton, Great Lakes and Midwest Steel projects revealed that National had been subjected to overcharges in "157 different ways." Beutler testified further that, in auditing both the Great Lakes and Midwest Steel projects, he dealt extensively with the defendant; indeed, Weidman, according to Beutler, defended the legitimacy of the charges (as well as other apparent improprieties involving Walsh personnel) by arguing that such practices had been the rule in the past, so that "we are just continuing to do business as usual." These overcharges and improprieties were quite similar to those found at Burns Harbor.

Buetler also testified that, in the early stages of his audit of the Great Lakes project, he was given access to certain work records (the so-called "time cards"), but that Weidman later denied him access to those cards. As it turned out, the time cards were an important source document for the audit since the costs of the benefits that were fraudulently obtained by Walsh officials were often concealed in fictitious work records. Beutler's testimony on this point became especially significant once the Government established that, within six months of the Great Lakes audit, Weidman ordered the time cards destroyed at Burns Harbor.

4. Significantly, Rule 494(b) does not require the defendant to be an active participant in the other similar acts.

until *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2292, 49 L.Ed.2d 342 (1976), that the Court identified the criteria to be used in determining whether evidence is sufficiently "material" to make its nondisclosure a constitutional error. The standard of materiality, according to the Court, varies with three distinct factual settings:

1. the undisclosed evidence demonstrates that the prosecution's case included perjured testimony;
2. the defense made no request, or only a general one, for the undisclosed material;
3. the defense made a specific request for the evidence.

In the case of perjured testimony, the Court held that a conviction must be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103, 96 S.Ct. at 2397. In the case of a general request, however, the Court found that a new trial is justified only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. at 2401. Finally, in the case of a specific request, while the Court did not define the precise standard of materiality to be applied, it did clearly indicate that a lesser showing of materiality is required than in the case of a general request. 427 U.S. at 106, 96 S.Ct. 2392. With these general principles in hand, we may now turn to a consideration of the appellant's specific claims.

### A. The 1972 Immunity Discussions

The 1972 immunity discussions between Walter Cox and the Government were cut short when Cox withdrew from further negotiations after receiving an anonymous threat on the life of his son.[5] These initial discussions, then, did not result in any promise, agreement or understanding of any kind; and it was not until 1974 that the Government formally tendered the grant of immunity under which Cox was eventually to testify at trial.[6]

The appellant nevertheless argues that the Government violated its constitutional duty of disclosure by failing to reveal that Cox had previously negotiated for full immunity.[7] In particular, citing language from the Supreme Court's opinion in *Agurs* —"the failure to make any response [to a specific and relevant request] is seldom, if ever, excusable"[8]—Weidman claims that this information was specifically requested, that its nondisclosure was thus a constitutional error, and that a new trial is therefore required.

■ However, even if the 1972 discussions did fall within the scope of Weidman's request,[9] it does not follow as a matter of course that a new trial is warranted. It is true, of course, that the "nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1971). But under *Brady* as well as *Agurs*, the specifically requested but undisclosed information must still meet some standard of materiality, however defined, to justify a new trial. *Brady, supra*, 373 U.S., at 87, 83 S.Ct. 1194; *Agurs, supra* 427 U.S., at 106, 96 S.Ct. 2392.

---

5. The tapes of the 1972 discussions between Cox and the Government were surrendered to Cox's attorney when he withdrew from negotiations. It appears, then, that there is no record or transcript of the discussions, at least not in the hands of the Government.

6. This was the finding of the district court, and it is supported by evidence adduced at the August 31, 1976 hearing. Therefore, we will not disturb it on appeal. *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

7. In the agreement that was ultimately reached, Cox undertook to plead guilty to one count of filing a false tax return and to cooperate fully in the Burns Harbor prosecution, while the Government promised to grant him immunity against any other prosecution and to bring his cooperation to the attention of the sentencing judge in the tax case.

8. 427 U.S. at 106, 96 S.Ct. at 2399.

9. The pretrial request was for "all communications relating to *arrangements*" with witnesses.

■ Whatever that standard may be, it was not met here, for the 1972 discussions simply cannot be viewed as "material" in any meaningful sense of the word. It appears from the record that the Government's effort to implicate Weidman in the Burns Harbor fraud was based largely on the testimony of witnesses other than Cox.[10] More importantly, however, Cox was ultimately given immunity and the terms of the agreement were fully disclosed to the accused; indeed, Cox was thoroughly impeached on these grounds at trial. It seems clear, then, that the mere fact of an earlier, aborted immunity discussion could not serve any significant purpose that was not already served (and more effectively) by the disclosed information on the actual immunity grant. Therefore, it is our conclusion that there is only a remote possibility that the undisclosed information could have affected the outcome of the proceedings below; and this possibility is not, by any standard, sufficient to establish "materiality" in the constitutional sense.

## B. The Alleged "No Fine" Agreement

■ The grounds for the appellant's second claim are found in the following remark made by the U.S. Attorney during Cox's sentencing proceeding:

> "[T]here is one agreement between Mr. Cox and his attorney and the Government which is not of record and that is that at the time of sentencing the Government would recommend that no fine be imposed on Mr. Cox and we do now make that recommendation."

Citing this statement, Weidman argues that there was a "no fine" agreement between the Government and Cox, and that this, too, should have been disclosed under *Brady*. Moreover, as the appellant points out, Cox testified at trial that the terms of the grant of immunity represented his only agreement with the Government. It would seem, therefore, that if there was in fact a "no fine" arrangement, then the prosecution

failed to correct a Government witness who testified falsely at trial. See *Agurs, supra* at 103–04, 96 S.Ct. 2392.

At the evidentiary hearing, however, the trial court determined that the Government had not made any promises to Cox other than those contained in the written plea agreement. This conclusion was based on the testimony of Cox, his trial counsel and, most importantly, the U.S. Attorney, who declared that his earlier remark at the sentencing proceedings had been a "misstatement":

> "I know this: that at no time did we ever promise to anybody, either what they would get, or what we would recommend. We made no promises to anyone, including Walter Cox."

Quite clearly, then, the appellant's argument on appeal entails the conclusion that the testimony of the U.S. Attorney was false. This court, however, is not free to determine such matters de novo; rather, we must accept the lower court's findings of fact and credibility so long as those findings are not "wholly unsupported by the evidence." *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946). And here, the appellant's speculations on human nature simply do not provide any firm ground for us to discredit the explanation supplied by the U.S. Attorney. We must conclude, then, that there is a sufficient basis in the record to support the trial court's conclusion that the Government did not make a "no fine" agreement with Cox. Moreover, the Government's failure to disclose whatever discussions may have been held on this point stands on an equal footing with its failure to disclose the 1972 immunity discussions: neither is sufficiently material to warrant a new trial.

## C. The NLRB Incident

In the course of the evidentiary hearing on the motion for a new trial, a number of

---

**10.** In this connection, the testimony of Elmer Haney, William Weaver, Maurice Strandberg and Woodrow Buckley was particularly significant. It appears that the Government relied on the testimony of Cox principally to establish the existence of the general scheme and the ways in which it operated.

documents were produced which dealt with Cox's alleged 1972 attempt to bribe Stanley J. Fender, a Field Examiner for the National Labor Relations Board. The documents included an NLRB letter to the U.S. Attorney requesting an investigation of the charge, an FBI report on the investigation that was subsequently conducted, and the U.S. Attorney's declination of prosecution. In addition, Fender produced at the hearing his handwritten account of a "statement" that Cox had provided (but refused to sign or even read) on the fraudulent scheme at Burns Harbor.

It is Weidman's claim once again that the Government's failure to produce the NLRB file containing these documents in the face of a specific request violated its duties of disclosure under *Brady* and *Agurs.* Of particular importance, according to the appellant, is Fender's handwritten account of Cox's "statement," for that account makes no mention of Weidman's name in describing the Burns Harbor fraud. In addition, however, the appellant also insists that details on the alleged bribery attempt could have been useful in impeaching the witness.

In the factual setting of this case, the appellant's argument raises some major questions concerning the scope of the prosecutor's constitutional obligation to produce evidence favorable to the defendant. The Supreme Court's decision in *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1197. This holding, in turn, was grounded on certain basic elements of fairness that are implicit in the due process requirements of a fair trial. More particularly, the Court indicated that a fundamental notion of fair-

ness in criminal trials demands "that the state in its zeal to convict a defendant not suppress evidence that might exonerate him." *United States v. Agurs*, 427 U.S. 97, 116, 96 S.Ct. 2392, 2403, 49 L.Ed.2d 342 (Marshall, J., dissenting).

■ It seems clear that the essential unfairness found by the Court in the ´*Brady* setting is directly bound up with the fact of "suppression"—that is, some act or failure to act on the part of the prosecution which renders material exculpatory evidence unavailable to the accused.[11] Indeed, in this element of suppression lies the constitutional basis for distinguishing *"Brady"* material from all other kinds of newly discovered evidence. For if the evidence is available to the accused from some source other than the prosecution, and if he is aware of both the evidence and its source, he could in no way be harmed by the prosecution's failure to produce the documents. As a result, there could be no basis for finding unfairness, and, hence, no basis for finding a due process violation.

■ In this case, the NLRB file on Walter Cox was not rendered unavailable to Weidman by the prosecution's failure to produce it. The file, as it turned out, was not in the hands of the prosecution, nor, apparently, was the prosecution even aware of the alleged bribery attempt before Weidman requested the file three weeks after the trial had begun. The defendant, however, was well aware that Cox had been accused of attempting to bribe the official; indeed, he cross-examined Cox on this very point.[12] And, what is equally important, he could have obtained the evidence that he now claims should have been produced under *Brady* by simply subpoenaing the file from the NLRB (a nonprosecutorial agency of the government) and subpoenaing Fend-

---

**11.** The evidence could be made unavailable to the accused in either of two ways: (1) he is not made aware of its existence; or (2) he is aware of its existence but unable to obtain it.

**12.** Cox admitted that he had been investigated by the FBI but denied the attempted bribe.

Under Rule 608(b) of the Federal Rules of Evidence, the defendant could not have proved the bribe by extrinsic evidence. It would seem, therefore, that the documents on the alleged bribe could not have provided any additional impeachment material.

er himself.[13] This, in fact, is precisely what he did at the evidentiary hearing on the motion for a new trial.

Whatever the explanation for the defendant's failure to pursue this course earlier— and none is offered on appeal—we cannot agree that he was denied a fair trial by the failure of the prosecution to produce the evidence. The file (and, most importantly, the "statement" that Cox gave to the NLRB official) was not in the hands of the prosecution; the accused was well aware of its existence; it was available to the accused from a nonprosecutorial source. On these facts, it cannot be said that the prosecution has engaged in a "suppression" of evidence within the meaning of *Brady*.

 The appellant also argues that the prosecution's failure to produce the "statement" that Cox gave to the NLRB official violated its obligations under the Jencks Act, 18 U.S.C. § 3500, which provides in relevant part:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

\* \* \* \* \* \*

(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

It is by no means clear that Fender's handwritten account of the interview with Cox (which Cox refused to sign or even read) is a "statement" within the meaning of 18 U.S.C. § 3500(e)(2). Nor is it clear that the Jencks Act requires the prosecution to discover and produce "statements" that are in the possession of other, nonprosecutorial agencies of the government. Indeed, on this point, we find the view of the Third Circuit to be a persuasive one:

"In speaking of statements 'in the possession of the United States', we understand the statute to require production only of statements possessed by the prosecutorial arm of the federal government." See *Augenblick v. United States*, 377 F.2d 586, 597–98, 180 Ct.Cl. 131 (1967), *rev'd on other grounds*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *United States v. Ehrlichman*, 389 F.Supp. 95 (D.C.Cir. 1974).

*United States v. Dansker*, 537 F.2d 40, 61 (3rd Cir. 1976).

However, even if we were to resolve these questions in the appellant's favor and hold that the Jencks Act required the production of the document, we could not agree that its nonproduction so prejudiced Weidman as to warrant a new trial. "Jencks Act disclosures may be used by the defense only for the purpose of impeachment," *United States v. Harris*, 458 F.2d 670 (5th Cir. 1972), and this document could only have been of marginal value to the appellant's defense as material for impeaching Cox. Since the statement did not pretend to be an exhaustive chronicle of the Burns Harbor mail fraud, there simply is no necessary inconsistency between its omission of Weidman's name and those portions of Cox's subsequent testimony that may have implicated the appellant. Perhaps more importantly, as was noted earlier, it appears from the record that Cox's testimony was not an integral part of the Govern-

---

**13.** Fender was mentioned by name when Cox was questioned on the alleged bribery attempt by the defense attorney.

ment's effort to establish Weidman's involvement. Rather, the prosecution relied on other witnesses for this purpose, while using Cox's testimony to establish the existence of the general scheme and the ways in which it operated. Finally, as was also noted earlier, Cox was thoroughly impeached on other grounds: he was presented as a convicted felon, a central figure in the mail fraud scheme, and a witness who had secured immunity from the Government in exchange for his cooperation; moreover, his biased attitude toward Weidman became evident in the course of his testimony. In the light of all this, we cannot agree that the nonproduction of the statement so prejudiced the appellant as to require a new trial.

In sum, then, we have carefully examined each of the appellant's arguments and find no basis for granting a new trial. The judgment of the district court is therefore

AFFIRMED.