UNITED STATES of America, Plaintiff-Appellee,

v.

Ronald GRZYWACZ, Edward Goclan and Richard Krieshok, Defendants-Appellants.

Nos. 78–2301, 78–2302 and 78–2303.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1979.

Decided Aug. 22, 1979.

Lawrence J. Fleming, St. Louis, Mo., for defendants-appellants.

Thomas W. Turner, Asst. U. S. Atty., Springfield, Ill., for plaintiff-appellee.

Before SWYGERT, GEWIN* and SPRECHER, Circuit Judges.

GEWIN, Circuit Judge.

On March 31, 1978 appellants Grzywacz, Krieshok and Goclan, former police officers of Madison, Illinois,. were each indicted on one count of conspiring to violate § 1962(c) of the Racketeer Influenced and Corrupt Organizations statute (RICO) in violation of 18 U.S.C. § 1962(d) and one count of making false declarations to a federal grand jury in violation of 18 U.S.C. § 1623. They were tried by a jury and found guilty on all counts. The district court sentenced Grzywacz to 12 years imprisonment on the conspiracy count and 5 years on the perjury charge, the sentences to be served concurrently. Goclan and Krieshok each received 7 year sentences on the conspiracy counts

---

* The Honorable Walter P. Gewin, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

and 5 years imprisonment for perjury, to be served concurrently.

In these consolidated appeals the three appellants assert various alleged errors which they claim warrant a new trial. Finding the contentions to be without merit, we affirm the convictions.

Appellants were alleged to have conspired to violate the RICO statute by conducting and participating in the conduct of an enterprise, the Madison, Illinois Police Department, through a pattern of racketeering activity.[1] The indictment under which they were charged alleged as the essence of the conspiracy that the officers used their official positions as members of the police department to solicit and accept bribes and sexual favors from business establishments in the city of Madison and Madison County in exchange for acquiescence in and protection of certain illegal activities by the establishments, including prostitution, and operating after closing hours.[2] The indictment also charged that appellant Ronald Grzywacz used his relationship with the Madison County sheriff's office to solicit and accept bribes from similar businesses in Madison County.

Prior to trial appellants moved to strike the portions of the indictment referring to those acts occurring outside the city limits of Madison, beyond which the municipal police department had no jurisdiction. They argued that the "Madison County" evidence was irrelevant, prejudicial and without relationship to the conduct of the affairs of the police department alleged in the indictment. The government responded that these activities were part of the overall conspiracy and the court accordingly overruled appellants' motion.

At trial the government adduced substantial evidence relating exclusively to certain acts committed jointly and separately by all three appellants in the city of Madison. This proof, consisting of statements by the appellants and testimony by police officers, operators of business establishments and the Mayor of Madison, indicated that the three officers, with the assistance of tavern owner Jenny Huey,[3] engaged in a pattern of securing monetary payments and sexual favors from city tavern and tow company

1. The perjury counts against appellants charged that they falsely stated to the grand jury that they had received no bribes from businesses.

2. The indictment stated in pertinent part:

   5. It was a part of the conspiracy that the defendants would utilize their official positions as members of the City of Madison Police Department to ask, seek, solicit and accept payments from business establishments while intending to be influenced in the performance of acts related to their employment and functions as public officers.

   6. It was a further part of the conspiracy that the defendant, Ronald Grzywacz, would utilize his relationship with the office of the Sheriff of Madison County, Illinois, to ask, seek, solicit and accept payments from business establishments within the jurisdiction of the Madison County Sheriff's office.

   7. It was a further part of the conspiracy that the defendants, as law enforcement officers, would be paid by individuals seeking to operate their business establishments in violation of the laws of Illinois, the City of Madison, and Madison County.

   8. It was a further part of the conspiracy that certain business establishments in the City of Madison and in Madison County would be forced to pay money to the defendants and to provide sexual favors for "protection" and to avoid harassment by the defendants.

   9. It was a further part of the conspiracy that certain business establishments in the City of Madison and in Madison County would be permitted to house prostitution operations in violation of the laws of the State of Illinois.

   10. It was a further part of the conspiracy that certain taverns in the City of Madison and in Madison County would be permitted to operate after legal closing hours.

   11. It was a further part of the conspiracy that the defendants, as law enforcement officers, would agree and promise to refrain from interfering with illegal activities being conducted at certain business establishments in the City of Madison and in Madison County.

   12. It was a further part of the conspiracy that the defendants would attempt to recruit other law enforcement officers to participate in the criminal objectives of the enterprise.

3. Huey was called to testify by the government but refused asserting her privilege against self-incrimination. Upon being granted immunity, she still refused to take the stand and was found in contempt of court.

operators and employees in return for "protection" of certain illegal activities by the businesses. In addition a significant amount of evidence relating to appellant Grzywacz's activities in Madison County was offered and admitted. The evidence tended to show that at the time the three officers were collecting bribes in the city of Madison, Grzywacz in coordination with members of the Madison County sheriff's office was engaged in similar "shakedowns" of tavern operators in the county, outside the Madison police department's jurisdiction. The proof implicated Grzywacz only; none of it showed involvement by Goclan and Krieshok in the solicitation and acceptance of bribes in the county.

At the conclusion of the trial,[4] the government tendered an instruction stating that the Madison County evidence could not be considered against Goclan and Krieshok but was admissible as evidence of prior misconduct against Grzywacz to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. Contending that the government no longer considered the Madison County activities to be part of the conspiracy, appellants moved to strike all references in the indictment to Madison County and to strike all evidence relating to those activities. They further moved for a mistrial on grounds that the trial court erroneously admitted the evidence. The court struck portions of the indictment relating to the county but denied the motion for mistrial, finding the evidence admissible for the purposes advanced by the government. In his final instructions the trial judge warned the jury that the evidence was to be considered only as to Grzywacz to show motive, intent, plan, opportunity, etc.

As their initial contention on this appeal appellants maintain that they could not be charged with conspiracy under 18 U.S.C. § 1962(d), the RICO statute, because the Madison, Illinois police department is not an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Appellants presented this ground in a pretrial motion to dismiss the conspiracy count but the trial court rejected it.

Section 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Enterprise" as used in § 1962(c) is defined in 1961(4) to include:

any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

According to appellants, a public entity such as a municipal police department can not constitute an "enterprise engaged in . . . interstate or foreign commerce. . . ." They submit that Congress in enacting the Racketeer Influenced and Corrupt Organizations statute (18 U.S.C. §§ 1961–1968) intended primarily to combat the infusion of organized racketeering into the activities of legitimate *private* businesses. In contrast there was no legislative intent to apply the statute to acts of corruption by public employees or officials. In support of this view, appellants advert to the civil remedies provided by section 1963 of the statute. These include a private action for treble damages and actions by the United States Attorney General for divestiture, dissolution or reorganization of the enterprise, and restrictions on investments by persons therein. Appellants contend these statutory remedies are peculiar to violations by private organizations and therefore public entities were meant to be excluded from the statute's range of coverage.

Consideration of past precedent, legislative history, and the plain words of the

---

4. When the government completed the presentation of its case, each appellant asserted his Fifth Amendment right and refused to testify for his co-defendants. The defense then presented no direct evidence and rested its case. (Vol. VI, pp. 925–28).

statute convince us that the RICO statute admits of a broader, less constricted interpretation. We believe that public entities and individuals may constitute § 1961(4) enterprises through which racketeering is conducted. Both the Third and Fifth Circuits have so held. In *United States v. Frumento*, 563 F.2d 1083 (3d Cir. 1977), *cert. denied sub nom. Millhouse v. United States*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), the Court of Appeals for the Third Circuit determined that the act was designed to prevent organized crime from infiltrating public and private entities which have some relationship with the economy. 563 F.2d at 1090. To this end Congress authored flexible legislation offering the various civil remedies cited above as well as criminal penalties[5] to protect from racketeering individuals and organizations in different and diverse areas of American life. *Id.* at 1090–91.

In a case highly similar to the cause before us, the Fifth Circuit in *United States v. Brown*, 555 F.2d 407 (5th Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978), held that the Macon, Georgia municipal police department constituted an enterprise within the meaning of the statute. The *Brown* court rejected the appellants' contentions that the statute encompassed only private corporations and labor organizations as overly narrow and unsupported by legislative history. 555 F.2d at 415. The court noted that the actual language of § 1961(4) defines enterprise as any "legal entity" or "group of individuals

associated in fact although not a legal entity." *Id.* From this broad language it concluded that a police department may be, at the least, a group of individuals associated in fact, if not a "legal entity." *Id.*

Scrutinizing the pertinent legislative history, the court recognized that Congress enacted the Organized Crime Control Act of 1970, of which the RICO statute was a portion, to reduce the flow of illegal activities into organizations which corrupt "democratic processes" and "threaten domestic security." *Id.* Finally the court relied on the explicit language that the provisions of the Organized Crime Act of 1970 were to be "liberally construed" to achieve "their remedial purpose." *Id.* at 416.

Our view is in accord with that of the Third and Fifth Circuits. As the Fifth Circuit noted in *Brown*, Congress articulated that the statute is to be liberally construed to effectuate its remedial purposes. Organized Crime Control Act, Pub.L.No. 91–452 § 904, 84 Stat. 922. Yet, even a restricted reading of the expansive definition of "enterprise" permits the application of § 1962(d) to public entities such as police departments. Section 1961(4) draws no distinctions between the public and private sector. Rather it includes as legal entities "individuals, partnerships, and associations." We are convinced that within this broad language, a police department and individual police officers are legal entities and thus qualify as enterprises.[6]

---

5. 18 U.S.C. § 1963.

6. Recognizing that Congress "intended to prohibit any pattern of racketeering activity in or affecting commerce" and that it intended the term "enterprise" to have "a very broad meaning", this circuit in *United States v. Cappetto*, 502 F.2d 1351, 1358 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975), held that an illegal activity such as a gambling operation may be a § 1962(c) enterprise through which racketeering is conducted. The court admittedly did not address the applicability of the statute to public entities. But the liberal construction given the definition of "enterprise" by it runs counter to appellants' argument that the RICO statute was intended to govern the activities only of *legitimate* private businesses. Our interpretation that public

entities are within the scope of the statute follows the approach employed in *Cappetto*. To accept appellants' claim that a narrow construction is appropriate would be inconsistent with the underlying principles of that decision. *See also United States v. Nerone*, 563 F.2d 836 (7th Cir. 1977); *United States v. Winstead*, 421 F.Supp. 295 (N.D.Ill.1976). At least three other circuits have applied the statute to illegal enterprises, reasoning that a broad interpretation was necessary to achieve the remedial objectives of the enactment. *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976); *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976); *United States v. Campanale*, 518 F.2d 352 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). *But see United*

Moreover, the legislative history manifests a serious concern by Congress not merely with a profusion of racketeering activities within private businesses and labor organizations, as appellants suggest, but with the potentially devastating effects of organized crime on the nation's political and economic system as a whole. This alarm was expressed in the Statement of Findings and Purpose of the Organized Crime Control Act of 1970.

> The Congress finds that (1) organized crime in the United States is a highly sophisticated, *diversified*, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud and corruption;
>
> .    .    .    .    .
>
> (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to *subvert and corrupt our democratic processes*;
>
> (4) organized crime activities in the United States . . . threaten the domestic security, and undermine the *general welfare of the Nation and its citizens*;
>
> .  .  . .

Pub.L.No. 91–452, § 1, 84 Stat. 922 (emphasis added). The logical inference from these pronouncements is that Congress intended to frame a widely encompassing enactment to protect both the public and private sectors from the pervasive influences of racketeering. We decline to adopt the myopic vision of Congressional policy advanced by appellants and instead elect to give the statute the construction required of us by explicit mandate. The Madison police department is an enterprise within the meaning of section 1961(4).

*States v. Mandel*, 415 F.Supp. 997 (D.Md.1976); *United States v. Moeller*, 402 F.Supp. 49 (D.Conn.1975).

7. Professor Wigmore succinctly explained the use of similar acts to prove design or pre-existing plan.

Design or Plan  .    .  ., is not part of the issue, an element of the criminal fact

■ The second alleged error which this court must consider is the trial court's admission into evidence of the "Madison County" evidence. It is appellants' contention that this proof was inadmissible even for the limited purposes requested by the government because it was overly prejudicial to codefendants Goclan and Krieshok and the trial court failed to give limiting instructions at the time the evidence was introduced. Appellants further argue that the court should have excluded the evidence because Grzywacz had not placed his specific intent in issue.

Whether Grzywacz disputed the element of specific intent at trial is irrelevant since the court properly admitted the evidence to also show preparation and plan or design, and a mode of operation. Fed. Rules of Evidence 404(b) expressly sanctions the use of similar acts of prior misconduct for these objectives. The Madison County evidence was highly probative of such matters. It showed that at approximately the same time the three officers were using their official positions to collect payoffs from taverns and tow companies within the city of Madison, Grzywacz was utilizing his status and authority as a law enforcement officer to engage with members of the sheriff's office in a pattern of collecting bribes from businesses in the county. There was no remoteness in time between the activities. Moreover, the evidence of appellants' conduct in the city showed Grzywacz to be an active participant and possible ringleader of the alleged conspiracy.

Because the county activities had a significant "concurrence of common features" with the racketeering conducted by appellants in the city, the "Madison County" evidence, with its corroborative character, tended to show a preexisting plan and *modus operandi* followed by Grzywacz.[7] It

charged, but is the preceding mutual condition which evidentially points forward to the doing of the act designed or planned (citations omitted). Thus the peculiarity of Design is that the act is not assumed to be proved, and the design is evidentially to show its probable commission.

was therefore highly relevant to the basic question of whether he committed the alleged offense.

This court has approved the admission of evidence of similar acts for these purposes when the trial judge determines its probative value outweighs its prejudicial impact. *United States v. Weidman,* 572 F.2d 1199, 1202–03 (7th Cir. 1978); *United States v. Grabiec,* 563 F.2d 313, 318 (7th Cir. 1977); *United States v. Krohn,* 560 F.2d 293, 296–97 (7th Cir. 1977); *United States v. Iacullo,* 226 F.2d 788, 793 (7th Cir. 1955).[8] Broad discretion is accorded a trial judge in this determination, *United States v. Serlin,* 538 F.2d 737, 747 (7th Cir. 1976). The district court in the instant case decided at the conclusion of the trial that the possible spillover effect on Goclan and Krieshok was overborne by the crucial importance of shedding light on the racketeering scheme by showing a similar plan carried out in the county by Grzywacz and members of the sheriff's office.

We believe this determination was proper, given the careful limiting instructions read to the jury by the court at the trial's conclusion. This admonition was stated in the following language:

> There has been no evidence introduced in this case to connect defendants Edward Goclan and Richard Krieshok with the alleged activities of defendant Ronald Grzywacz with respect to the Sheriff's office and the taverns and towing companies located outside the City of Madison, Illinois, that is, in Madison County. Therefore, those activities may not be considered in any way as evidence against defendants Goclan and Krieshok. Rather it was introduced against defendant Grzywacz only to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Vol. VII, p. 1024–1025).[9]

The instruction adequately restricted the jury's attention to Grzywacz. Appellants' argument that a contemporaneous limiting instruction was required is meritless since the record reveals that at no time did the defense request such an instruction of the court.

In sum the trial judge properly admitted the evidence of similar acts as going to the planned design and *modus operandi* of appellant Grzywacz. The procedures employed by the court were sufficient to prevent undue prejudice to Goclan and Krieshok.

▮ A final major contention is that the trial court erred in permitting the government to place in evidence certain out-of-court statements made by appellants and their alleged co-conspirator Jenny Huey. Among the challenged statements were a recorded conversation of Grzywacz wherein he admitted collecting bribes, Grzywacz's grand jury testimony in which he admitted

---

2 Wigmore on Evidence, § 1300 at 193 (3d ed. 1940). He then distinguished design from evidence used to show intent.

> In the former case (of Intent) the attempt is merely to negate the innocent state of mind at the time of the act charged, in the present case [of design] the effort is to establish a definite prior design or system which included the doing of the act charged as a part of its consummation. . . . The added element [in showing design] then, must be, not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.* (emphasis in original).

*Id.* § 304 at 202.

**8.** Of significant resemblance to the instant case is *United States v. Grabiec, supra,* where co-defendants were charged with conspiracy to ex-

tort money under color of official right, in violation of 18 U.S.C. § 1951. At trial the court permitted the government to adduce evidence that one defendant had accepted similar illegal payoffs on four previous occasions. On appeal this court held the acts admissible "to show a pattern of conduct corroborating a similar pattern carried out during the conspiracy and a method of operation." *Id.* at 318, *citing United States v. Iacullo, supra.* The court reasoned that the challenged transactions "illuminated the character of the conspiracy and the extent of the involvement of the participants." *Id.*

**9.** In addition, the trial judge carefully instructed the jury on the relevance of similar acts. Vol. VII, pp. 1030–31. The instructions were thorough and appellants do not challenge their sufficiency on this appeal.

obtaining bribes and stated that he saw Goclan receive money from Jenny Huey. Also admitted into evidence was grand jury testimony by Goclan and Krieshok in which they related the events surrounding a raid on Jenny Huey's tavern, alleged statements by Goclan and Krieshok to various persons soliciting bribes, and alleged remarks by Jenny Huey to certain witnesses that pay-offs were being made to appellants in exchange for protection.

Appellants claim that under the recent decision of *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the trial judge, prior to admitting the statements, was required to determine out of the jury's presence whether the statements were made in furtherance of a conspiracy of which each defendant was a member.[10] As a corollary to this argument, they assert that admission of the statements by the appellants necessitated a severance of their trials under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), since each appellant had no opportunity to cross-examine his codefendants on the statements. During the trial each appellant asserted his Fifth Amendment right and refused to take the stand. The appellants did offer to testify if separate trials were granted. The court, however, refused to grant a severance.

The decision in *Santiago* was issued after the completion of the trial below. At trial during the testimony of the government's first witness, Robin Young, the trial judge admonished the jury that whenever it appeared beyond a reasonable doubt that a conspiracy existed and a defendant was a member, statements knowingly made and acts committed by any person likewise found to be a co-conspirator could be considered against the defendant, but only if the statements were made in furtherance of the conspiracy and during its continuance. If not, the acts and statements could be considered only as evidence against the person making them. (Vol. 1, p. 26). The trial judge repeated these instructions to the jury at the close of trial.

The court's articulation of the rule on co-conspirator statements adhered to the law then in effect in this circuit. *United States v. Santiago*, 582 F.2d 1128, 1131–32 (7th Cir. 1978); *see United States v. Santos*, 385 F.2d 43 (7th Cir. 1967). Furthermore appellants did not object to the instructions nor did they request other limiting instructions at any time during the course of trial. Thus they have no cause to challenge those instructions on appeal. *See Santiago, supra* at 1136. This is true particularly in light of the fact that evidence adduced independently of the statements clearly established an active conspiracy among the three appellants and Jenny Huey.

As to the *Bruton* issue, we do not believe that constitutional error was committed by the trial court's refusal to grant a severance. Though damaging to appellants, the statements, when considered within the context of the other evidence, were not of a "devastating", "crucial" or "powerfully incriminating" nature, to which *Bruton* largely has been limited. *See Dutton v. Evans*, 400 U.S. 74, 87, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Neither were they inherently unreliable statements as those of a coerced confession, *see Bruton, supra; Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), or those produced by prosecutorial or judicial misconduct, *United States v. Cogwell*, 486 F.2d 823, 834 (7th Cir. 1973).

The decision to grant a severance lies within the sound discretion of the trial

---

10. A number of statements made by Grzywacz, Krieshok and Goclan were offered and admitted pursuant to Fed.Rules of Evidence 801(d)(2) as admissions of a party-opponent. Appellants have chosen to categorize these as co-conspirator statements and attack them on the basis of *Santiago*. Their admissibility under Rule 801(d)(2) is not challenged. We note that with one exception the statements were admitted at trial without a contemporaneous instruction that they were only to be considered against the declarant. But at no time during the course of the trial did appellants request a limiting instruction. Given this and the fact that the trial judge gave a specific and scrupulous limiting admonition in his final instructions, no prejudicial error was committed. *See United States v. Esquer*, 459 F.2d 431, 435 (7th Cir. 1972).

court, reversible only for an abuse of discretion. *United States v. All State Mortgage Corp.,* 507 F.2d 492, 495 (7th Cir. 1974). In order to secure a severance the moving party must establish that she or he will be unable to obtain a fair trial. *United States v. Crouch,* 528 F.2d 625, 631 (7th Cir. 1976). Appellants have not made this showing with respect to the extra-judicial statements. The trial judge properly exercised his discretion.

· We have scrutinized the other contentions advanced by appellants and find them devoid of merit.

It is appropriate to note that in its ultimate significance this case is immensely tragic not only because it involves the corruption of human beings but because the offenses found by the jury reflect a callous disregard by public servants of their moral and legal responsibilities and a sordid abuse of their public trust. Such misconduct by law enforcement officials undermines respect for the legal principles upon which the survival and growth of a free society depend. Grzywacz, Goclan and Krieshok have received a fair trial, the judgment is Affirmed.

SWYGERT, Circuit Judge, dissenting.

Because I believe that the Madison City Police Department is not an "enterprise" within the meaning of Title IX of the Organized Crime Control Act of 1970 ("Act"), I must dissent. Even if this were not the case, I also believe that the wholesale introduction of the Madison County evidence was so prejudicial as to require reversal and a new trial.

1. Several of the broad phrases which the majority opinion depends on are taken from the Statement of Findings and Purposes, Pub.L. 91–452, § 1, 84 Stat. 922, and are in reference to all eleven titles of the Organized Crime Control Act. Such a broad introductory statement should not be used as authority for interpreting one specific definition within one of the eleven titles when much more relevant legislative history is available.

I

In determining that a police department is an enterprise, my Brothers place great reliance on broad language extracted from Title IX and its statement of findings and purposes, while ignoring narrower language found in the legislative history and in the statute itself. From such expansive phrases as "subvert and corrupt our democratic processes" and "general welfare of the nation" the majority concludes that "Congress intended to frame a widely encompassing enactment . . ." which includes governmental entities in the definition of "enterprise."[1] In view of the majority's interpretation it seems odd that out of 2097 pages of hearings, two congressional reports, and Title IX itself, there are no explicit references to governmental units as "enterprises" within Title IX. The more reasonable interpretation is that Congress did not intend the term "enterprise" to encompass government organizations.

Careful reading of the legislative history leads to no other conclusion. It is replete with references to the paramount purpose of Title IX: purging racketeering influences from the commercial life of the Nation.[2] In the introduction to the Senate hearings on the Act, Senator John McClellan, the bill's principal sponsor, stated that "[O]rganized crime's most recent venture is the infiltration of legitimate *business* and *unions.*" *Senate Hearings: Organized Crime, supra,* at p. 2 (emphasis added). Further on, then Assistant Attorney General Will R. Wilson made it clear that Title IX was ". . . designed to attack the infiltration of legitimate *business* by organized crime." *Id.* at 387 (emphasis added). The Hearings of the House of Representatives are filled with similar comments. Senator

2. *Measures Relating to Organized Crime: Hearings on S.30, et al. Before the Subcommittee on Criminal Laws and Procedures,* 81st Cong., 1st Sess. (1969); *Organized Crime Control: Hearings on S.30 Before the Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives,* 91st Cong., 2d Sess. (1970); S.Rep.No. 91–617, 91st Cong., 1st Sess. (1969); H.R.Rep.No. 91–1459, 91st Cong., 2d Sess. (1970), U.S.Code Cong. & Admin.News 1970, p. 4007.

McClellan again testified that Title IX ". . . is designed to prevent organized criminals from infiltrating legitimate *commercial organizations.*"[3] *House Hearings: Organized Crime, supra,* at p. 106 (emphasis added). These numerous references to business organizations and unions demonstrate that Congress was concerned with organized crime's infiltration of commercial entities, not of governmental agencies.

The legislative history also makes it clear that the single most important reason for the enactment of Title IX was the remedies it embodied. In the Senate Hearings, Assistant Attorney General Wilson stated that:

> While many violations of subsections (b) and (c) of section 1962 may also constitute by their very nature violations of the Hobbs Act, 18 U.S.C. § 1951, . . . the great advantage of these provisions is that proof of criminal violation inflicts a heavy penalty of financial loss by means of the forfeiture provisions of section 1963.

*Senate Hearings: Organized Crime, supra,* at p. 388. Indeed, the statement of findings and purpose of the Act indicated that ". . . the purpose of this Act [is to] seek the eradication of organized crime . . . by providing enhanced sanctions and new remedies . . . ." Pub.L.No. 91–452, § 1, 84 Stat. 922. The Senate Report discussed these remedies at greater length. It disclosed the inadequacy of the present sanctions and the need for new remedies which would divest organized criminals of illegal or illegally obtained commercial interests. The report concluded:

> Title IX represents the committee's careful efforts to fashion new remedies to deal with the infiltration of organized crime into legitimate organizations operating in interstate commerce.

*Senate Report: Organized Crime Control Act, supra,* at p. 83. The remedies provided by Title IX include the criminal sanction of forfeiture of any interest in the "enterprise" (section 1963) and the civil sanctions of divestiture, restriction of activities, and dissolution or reorganization of the "enterprise" (section 1964). These remedies cannot be applied to a public entity such as a police department. Police officers have no property interest in a police department which can be forfeited and, of course, a police department cannot be "dissolved." The primacy of the remedial provisions of Title IX and the total inapplicability of the provisions to governmental entities corroborate what the legislative history demonstrates: Congress had no intention of including governmental units within the ambit of the "enterprise" provisions of Title IX.

Additionally, the majority ignores two canons of statutory interpretation in reaching its conclusion that a police department can be an enterprise under Title IX. The first of these is the doctrine of *ejusdem generis* which ". . . warns against expansively interpreting broad language which immediately follows narrow and specific terms." *United States v. Insco,* 496 F.2d 204, 206 (5th Cir. 1976); *United States v. Altese,* 542 F.2d 104, 107 (2d Cir. 1976) (Van Graafeiland, J., *dissenting*). "[T]his maxim counsels courts to construe the broad in light of the narrow." *United States v. Baranski,* 484 F.2d 556, 566 (7th Cir. 1973). In this case the broad phrases used by the majority, *e. g.,* "any legal entity" and "[any] group of individuals associated in fact although not a legal entity," are preceded by narrower terms such as "legitimate business," "labor unions," "partnership," and "corporation." *See* statement of findings and purpose (3), *supra,* and 18 U.S.C. § 1641(4). These specific, narrow terms used in Title IX are a "listing of the common legal forms in which business entities and labor groups fashion themselves to carry out their private function." *United States v. Mandel,* 415 F.Supp. 997, 1021 (D.C.Md.1976). The broad phrases used by

---

**3.** This same assertion also can be found on pages 170, 327, 384, 433, 499, 579, and 687 of the *Senate Hearings: Organized Crime, supra.*

the majority to define "enterprise" must be construed to be limited to the same type and class of entities described by the narrower terms. A police department would not fall within the confines of this properly construed definition of enterprise.

The majority's second error of statutory interpretation is basing its holding regarding a provision which establishes criminal liability on Congress' instruction that the provisions of the Act be "liberally construed" to achieve "their remedial purpose." *Supra,* at p. 686. It is unclear whether Congress intended its directive to apply to those sections which establish criminal liability or merely to the "remedial" provisions of Title IX. By applying this directive to the criminal liability provisions, the majority has violated the due process principle that "statutes creating crimes are to be strictly construed . . . ." *United States v. Resnick,* 299 U.S. 207, 209, 57 S.Ct. 126, 127, 81 L.Ed. 127 (1936). *See also Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959). *See generally Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1971); *Grayned v. City of Rockford,* 408 U.S. 104, 108 n. 3, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Tribe, *American Constitutional Law,* 718–19 (1978).

In sum, nothing in the legislative history indicates that Congress intended governmental units to be included in Title IX. This conclusion is supported by the doctrine of *ejusdem generis,* the clear mandate of the Supreme Court to narrowly interpret

criminal statutes and the fact that Title IX's remedies are peculiar to commercial entities.[4]

## II

I also disagree with the majority's conclusion that the Madison County ("County") evidence was properly admitted pursuant to Fed.R.Evid. 404(b).[5] The quantum of the evidence and the fact that two defendants had no involvement with it render it so prejudicial as to outweigh any probative value it might have had. Further, when this evidence was admitted, it was improperly introduced.

The majority chooses to characterize the volume of this evidence as a "significant amount"; in fact, it is an overwhelming amount. The County evidence consumed virtually all of the first three days of the trial.[6] The Government's direct and redirect presentation of the County evidence consumed 223 pages and involved fifteen witnesses. The direct and redirect presentation of the City evidence consumed only 151 transcript pages. Further all or part of Government Exhibits 1, 1A, 1B, 3, 4, 5, 34, 36, and 38 could be classified as County evidence. More than half of the evidence presented by the Government was County evidence; yet, according to the majority, all of this was necessary to show "the planned design and modus operandi of appellant Grzywacz." *Supra,* at p. 688.

I do not dispute that evidence of similar acts of prior misconduct may be used to show opportunity, preparation, plan, etc. Fed.R.Evid. 404(b). But evidence of this

---

**4.** The majority relies on *United States v. Brown,* 555 F.2d 407 (5th Cir. 1977); and *United States v. Frumento,* 563 F.2d 1083 (3d Cir. 1977), *cert. denied sub nom. Millhouse v. United States,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). With all due respect to the Third and Fifth Circuits, I believe these opinions are incorrect for the reasons outlined above.

**5.** Fed.R.Evid. 404(b), states:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be

admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This evidence is not admissible unless its probative value outweighs its prejudicial effect. *United States v. Weidman,* 572 F.2d 1199 (7th Cir. 1978).

**6.** The total length of the trial transcript is 1040 pages. At the end of the third day the transcript ran to 505 pages. All but 35 pages of the evidence presented by the Government during the first three days was County evidence.

sort is not admissible unless its probative value outweighs its prejudicial effect. *Weidman, supra,* 572 F.2d at 1202–03. Weighing the probative value of the evidence against its prejudicial effect leads me to the conclusion that the County evidence should not have been admitted. Arguably its probative value is, as the majority stated, its utility in showing design and mode of operation of one of the three defendants.[7] But there can be little doubt about the potential prejudicial impact of the evidence. Little demonstration is needed to conclude that *three days* of County evidence would distract the jury's attention from the real issues in this case. Presented at the very beginning of the trial, the County evidence could serve only to create an aura of guilt against all three defendants before the jury had heard any evidence on the crime for which they actually were indicted.

This distracting evidence was prejudicial in its volume alone. The trial court should have "limit[ed] the evidence to the quantity that [was] necessary to the purpose for which it [was] admitted." *United States v. Ostrowsky,* 501 F.2d 318, 323 (7th Cir. 1974). Three days of evidence were not necessary to demonstrate Grzywacz' mode of operation and plan, especially where the evidence was unrelated to the indictment and was likely to create a bias against the defendants in the minds of the jurors. Further "[i]t is generally recognized that there can be no complete assurance that the jury even under the best of instructions will strictly confine the use of this kind of evidence to the issue of [planned design and modus operandi] and wholly put out of their minds the implication that the accused, having committed the prior similar criminal act, probably committed the one with which he is actually charged." *United States v. Byrd,* 352 F.2d 570, 574 (2d Cir. 1965).

The strongest reason for excluding the evidence, however, was its potential prejudicial effect on Goclan and Krieshok. Although the jury was admonished not to consider the evidence against them, it is unlikely that this instruction was effective in removing the prejudice since the City of Madison evidence, in conjunction with the joint trial of all three defendants, tended to establish a link between Grzywacz and Goclan and Krieshok. The power of guilt by association is not easy to dispel; the jury may well have credited Goclan and Krieshok with the acts of Grzywacz. I fail to see how this dangerous risk is outweighed by the need for showing one defendant's modus operandi.

The County evidence also was introduced improperly; no contemporaneous limiting instructions were given by the court. *See generally Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). The majority determined that this argument was meritless because the appellants did not request such an instruction. This brief dismissal of appellants' contention hardly seems fair given that the Government introduced the County evidence under a rationale entirely distinct from the theory upon which its admissibility finally was weighed. When the County evidence initially was presented, the Government insisted that it pertained to an overall substantive conspiracy. Only after all the evidence had been presented did the Government confess that the County evidence was not related to the conspiracy. Faced with a motion for mistrial, the Government tendered for the first time its theory that the evidence was admissible to show plan, design, etc.

**7.** The elements of a conspiracy offense are: (1) an agreement by two or more persons to combine efforts for an illegal purpose and (2) an overt act in furtherance of the agreement. *Nelson v. United States,* 415 F.2d 483 (5th Cir. 1969), *cert. denied,* 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 254 (1970). The Government concedes that the County evidence is not related to the conspiracy and was in no way connected to two of the three defendants; it is not evidence of an agreement nor does it constitute an overt act in furtherance of the conspiracy. It is evidence of actions by one of the defendants which is only indirectly relevant in proving the overt act. Thus its probative value is minimal and when probative value is weighed against prejudicial effect as required by *Weidman, supra,* 572 F.2d at 1202–03, the limited relevancy of the County evidence could hardly tip the scales in favor of admitting the evidence.

It appears as if the procedure employed by the Government was a pretext designed to gain the admission of the County evidence; the prosecution must have known there was insufficient evidence to connect the County evidence to the City conspiracy. In conference the Government stated that "there was at least an inference that could be drawn that [the County evidence] was part of the conspiracy." (Tr. p. 890.) Without any fact tying the County evidence to the conspiracy this inference is not permissible. Unfortunately, it is not unlikely that this inference took shape behind the closed doors of the jury room.

Because of the manner in which the County evidence was introduced, the volume in which it was received and the fact that it was hardly probative and highly prejudicial, I believe that the admission of the evidence was erroneous, and separately warrants reversal.