**UNITED STATES of America, Appellee,**

v.

**Leslie ANDERSON and Leonard Mooney, Appellants.**

**Nos. 79–1809, 79–1827.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1980.

Decided Aug. 7, 1980.

Rehearing Denied Sept. 12, 1980.

---

H. David Blair, Murphy, Blair, Post & Stroud, Batesville, Ark., and William R. Wilson, Jr., Little Rock, Ark., for appellants; Herbert L. Ray, Salem, Ark., on brief.

Kenneth F. Stoll, and Robert L. Neighbors, Asst. U. S. Attys., Little Rock, Ark., for appellee; George W. Proctor, U. S. Atty., Little Rock, Ark., on brief.

Before HEANEY, Circuit Judge, GIBSON, Senior Circuit Judge, and STEPHENSON, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Leslie Anderson and Leonard Mooney appeal their convictions pursuant to jury verdicts finding them guilty on all counts in which they were named of a twenty-eight-count indictment alleging that, while county judges in Arkansas, Anderson and Mooney devised a scheme to defraud and to obtain money from their county treasuries by means of false and fraudulent pretenses, representations, and promises.

Counts I and II of the indictment charged violations of Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, § 901(a), popularly known as the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) and (d) (1976). Counts V, VI, IX, and XVI charged violations of 18 U.S.C. §§ 2 and 1952 (1976) by interstate travel in aid of the unlawful activity of public servant bribery in violation of Arkansas law, Ark.Stat.Ann. § 41–2703 (1977). The remaining counts of the indictment charged mail fraud in violation of 18 U.S.C. § 1341 (1976).

The District Court[1] sentenced defendant Anderson to one year's imprisonment on Count I, to run concurrently with one-year sentences on Counts II, III, and V. Also on Count V, the court imposed a fine of $5,000. The court suspended imposition of sentence on the remaining counts in which Anderson was named and placed him on probation for

---

1. The Honorable Elsijane Trimble Roy, United States District Judge, Eastern District of Arkansas.

a period of two years, to run consecutively to the term of imprisonment imposed on Count I.

The District Court sentenced defendant Mooney to six months' imprisonment on Count I, to run concurrently with six-month sentences on Counts II, XVI, and XVII. Also on Count XVI, the court imposed a fine of $7,000. On all remaining counts in which Mooney was named, the court suspended imposition of sentence and placed him on probation for a term of two years, to run consecutively to the term of imprisonment on Count I.

On appeal, defendants jointly assert six errors on the part of the District Court: (1) permitting the application of RICO; (2) failing to grant severance of the trial; (3) allowing the Government to introduce testimony regarding Anderson's previous felony conviction; (4) forcing the defense to reveal the names of the prospective defense witnesses during the voir dire; (5) improper rulings regarding the selection of jurors; and (6) not granting a change in venue.

We agree with the defendants that the District Court erred in permitting RICO to be applied to the activities of defendants charged in the indictment, but find the remaining assertions of error meritless. We therefore reverse the convictions on Counts I and II and affirm the convictions on the remaining counts.[2]

## I. *Facts*

At all times relevant to the indictment, Anderson served as the county judge for Sharp County, Arkansas, and Mooney served as the county judge for Fulton County, Arkansas. In these capacities they acted as administrators for the counties.

Among their duties they managed the fiscal functions of their respective counties by approving and authorizing payment of bills and accounts. They were not judicial officers. Paul Baldwin, having already been convicted of paying bribes and kickbacks to county judges, acted as the Government's principal witness during the trial. According to his testimony, he operated ostensibly as a salesman of culverts, grader blades, oil, creosote, and other similar items. He sold his wares to county judges in Arkansas and county commissioners in other states. In the event he sold merchandise to one of these customers, he usually wrote out a sales slip setting forth the items to be shipped and the price. He would charge, on the sales slip, the list price, then rebate personally to the purchasing agent ten percent of the net amount of the price shown on the sales slip.[3] Sometimes he entered into a prior arrangement with the purchasing agent that no merchandise would be shipped. They would prepare a bogus voucher which would have the same documentation as a bona fide voucher, but he would give the purchasing agent fifty percent of the net amount instead of ten. The purchasing agent would sign for the goods at the time the voucher was prepared.

Baldwin testified that he had dealt with both Anderson and Mooney in this manner. Both defendants took the stand and denied having ever taken a bribe from Baldwin. They admitted having placed orders with Baldwin and having approved payment on the orders, but contended that the business dealings had always been legitimate. Pursuant to the alleged scheme, by the use of purely bogus invoices the citizens of Sharp

2. The Government has not raised the potential application of the Concurrent Sentence Doctrine to this case. *See Hirabayashi v. United States*, 320 U.S. 81, 105, 63 S.Ct. 1375, 1387, 87 L.Ed. 1774 (1943). We note that the District Court imposed sentences to run concurrently with the sentences on the RICO counts. This creates a situation where the reversal of the RICO counts does not affect the sentences of the defendants. Nevertheless, we consider it necessary to review the convictions on the RICO counts, even though we affirm the convictions on the remaining counts, because of the possible stigma stemming from the conno-

tations surrounding the offense of "racketeering." *See United States v. Vargas*, 615 F.2d 952, 960 (2d Cir. 1980); Note, *The Federal Concurrent Sentence Doctrine*, 70 Columbia L.Rev. 1099 (1970). We do not find it necessary to remand to the District Court for a new trial or resentencing. The evidence adduced at trial was relevant to the non-RICO counts, and there is no indication that the court in imposing sentences on these counts was in any way influenced by the disposition of the RICO counts.

3. The net amount did not include state taxes.

County were defrauded of $4,842.25, and the citizens of Fulton County of $7,179.60.

## II. *RICO Counts*

Appellants have presented a tangle of arguments challenging the application of RICO, 18 U.S.C. § 1962, to the facts of this case as alleged in the indictment. We address only the issue of the statutory interpretation of the term "enterprise" as used in RICO. Since we find that the RICO counts as charged in the indictment cannot stand under the definition of the term "enterprise" as it is used in the RICO statute, we find it unnecessary to decide the other issues raised in connection with RICO.

Count I of the indictment charges violation of 18 U.S.C. § 1962(c), alleging that
> LESLIE ANDERSON and LEONARD MOONEY were persons associated with an enterprise engaged in, and the activities of which affected, interstate commerce, namely each of the said defendants and Paul A. Baldwin were associated in fact to defraud, and to obtain money by means of false and fraudulent pretenses, representations and promises from Sharp and Fulton Counties, Arkansas, and the people of said counties, and the said defendants, LESLIE ANDERSON and LEONARD MOONEY, did knowingly and willfully conduct and participate directly and indirectly in the conducting of such enterprise's affairs through a pattern of racketeering activity as defined in Title 18, United States Code, Section 1961, * * *.

The pattern of racketeering activity is described in thirty-two subsequent paragraphs alleging separate violations of Arkansas and Federal law. All activity charged as "the pattern of racketeering" pertains to

the scheme to defraud the two counties by the judges' agreeing with Baldwin to prepare and submit bogus invoices and to approve payment for them, knowing that the merchandise would never be received by the counties.

Count II of the indictment charges violation of 18 U.S.C. § 1962(c) and (d), alleging that
> LESLIE ANDERSON and LEONARD MOONEY, defendants herein, being associated with an enterprise engaged in and whose activities affect interstate commerce, as defined in Section 1961 of Title 18, United States Code, that is the association in fact with Paul A. Baldwin, d/b/a The "Lisco" Company, did knowingly and willfully conspire, confederate and agree together and with each other, to conduct and participate in, directly and indirectly, conduct of subject enterprise's affairs, through a pattern of racketeering activity * * *.

All events allegedly constituting the "pattern of racketeering" activity, as well as those alleged as the overt acts in furtherance of the conspiracy, pertain to the scheme to defraud charged in Count I.[4]

This is the first time this circuit has confronted the problem of defining the scope of RICO. Several other courts have had occasion to address this issue, and have tortuously developed a history of case law construing the complicated statutory language. This history focuses primarily upon the terms "enterprise" and "pattern of racketeering activity." A close examination of the statutory language utilizing these terms is necessary.

Title 18 U.S.C., section 1962, provides in relevant part:

---

**4.** Although the wording of Count II of the indictment, "the association in fact with Paul A. Baldwin, d/b/a The 'Lisco' Company," does not seem clearly to define the relevant "enterprise," the arguments of the defendants and the Government suggest that they understand that the "enterprise" charged by this is meant to be substantially the same as that charged in Count I. We accept this characterization. Therefore, we do not address the issue of whether Paul A. Baldwin, doing business as the Lisco Company, by itself would constitute an "enterprise" within the definition in RICO. The case does not

appear to have been presented to the jury on this basis, and, if it had been, the question of whether defendants were sufficiently connected with Baldwin's business to be considered "associated with" it probably would have been hotly contested. We must restrict our analysis to the case as it was conceived in the lower court. "Criminal sanctions cannot rest on what an appellate court thinks the jury would have done had the issues put to it been framed differently." *United States v. Carman,* 577 F.2d 556, 568 (9th Cir. 1978).

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

The definition of "enterprise" as used in RICO appears in section 1961(4): " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Section 1961 also sets forth definitions of "racketeering activity" [5] and "pattern of racketeering activity." [6]

The scope of the term "enterprise" was first questioned in a federal court of appeals in *United States v. Parness*, 503 F.2d 430 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). In *Parness*, the Second Circuit held that a foreign corporation fell within the definition of "enterprise" and that the defendant's acquisition of a foreign corporation, with funds derived from criminal activity, fell within the ambit of RICO, 18 U.S.C. § 1962(a). In reaching this result, the court stated:

"[E]nterprise" is defined in section 1961(4) to include "any . . . corporation." On its face the proscription is all inclusive. It permits no inference that the Act was intended to have a parochial application. The legislative history, moreover, strongly indicates the intent of Congress that this provision be broadly construed.

*Id.* at 439.

This language regarding the congressional intent for broad construction of the term "enterprise" was quickly adopted by the Seventh Circuit in a substantially different context. In *United States v. Cappetto*, 502 F.2d 1351, 1358 (7th Cir. 1974), the Seventh Circuit found that a broad construction of the term "enterprise" required that an illegal gambling business fit within this category.[7] The court rejected the argument that the term included only legitimate operations, and found that any association of persons, regardless of the purpose for which organized, would fall within the meaning of the term. The court relied upon legislative history to support this conclusion. *Id.* (quoting Sen.Rep.No.91–617 at 72, 73 (1969)). However, the cited history did not in fact apply to RICO but referred only to Title VIII of the Organized Crime Control Act, 18 U.S.C. § 1955 (1976), dealing with the prohibition of illegal gambling businesses.

A broad construction of the term "enterprise" became more firmly entrenched and more expansive as more courts addressed the issue of the scope of RICO and built a body of precedent relying upon *Parness* and

---

5.  18 U.S.C. § 1961(1) states:

    (1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under * * * title 18 United States Code [§§ 201, 471, 472, 473, 659, 664, 891–94, 1084, 1341, 1343, 1503, 1510, 1511, 1951, 1952, 1953, 1954, 1955, 2314, 2315, 2421–24], (C) any act which is indictable under title 29, United States Code, section 186 * * * or section 501(c) * * *, or (D) any offense involving bankruptcy fraud; fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States[.]

6.  18 U.S.C. § 1961(5) states:

    (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]

7.  The *Cappetto* court reached this conclusion in the context of a civil case. The Government had not charged criminal violation of section 1962; it sought only civil remedies pursuant to 18 U.S.C. § 1964 (1976).

*Cappetto*.[8] *See, e. g., United States v. Aleman*, 609 F.2d 298, 304–05 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Grzywacz*, 603 F.2d 682, 686–87 & n.6 (7th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *United States v. Rone*, 598 F.2d 564, 568 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Swiderski*, 593 F.2d 1246, 1249 (D.C.Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979); *United States v. Brown*, 555 F.2d 407, 416 (5th Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *United States v. Forsythe*, 560 F.2d 1127, 1135–36 (3d Cir. 1977); *United States v. Frumento*, 563 F.2d 1083, 1089–91 & n.17 (3d Cir. 1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978); *United States v. McLaurin*, 557 F.2d 1064, 1073, (5th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978); *United States v. Altese*, 542 F.2d 104, 106 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *United States v. Hawes*, 529 F.2d 472, 479–80 (5th Cir. 1976); *United States v. Morris*, 532 F.2d 436, 441–42 (5th Cir. 1976). This trend toward an expansive definition has not proceeded without criticism, *see e. g., United States v. Aleman*, 609 F.2d 298, 311 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980), (Swygert, J., dissenting); *United States v. Rone*, 598 F.2d 564, 573–74 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (Ely, J., dissenting); *United States v.*

*Grzywacz*, 603 F.2d 682, 690–91 (7th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (Swygert, J., dissenting); *United States v. Altese*, 542 F.2d 104, 107–10 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977) (Van Graafeiland, J., dissenting); Bradley, *Racketeers, Congress, and the Courts: An Analysis of RICO*, 65 Iowa L.Rev. 837, 892–93 (1980); Atkinson, *"Racketeer Influenced and Corrupt Organizations," 18 U.S.C. §§ 1961–68: Broadest of the Federal Criminal Statutes*, 69 J.Crim.L. & Criminology 1 (1978); Note, Elliott v. United States: *Conspiracy Law and the Judicial Pursuit of Organized Crime through RICO*, 65 U.Va.L.Rev. 109 (1979); Note, *Title IX of the Organized Crime Control Act of 1970: An Analysis of Issues Arising in Its Interpretation*, 27 De Paul L.Rev. 89, 105, 112 (1977); Note, *Organized Crime and the Infiltration of Legitimate Business: Civil Remedies for "Criminal Activity"*, 124 U.Pa.L.Rev. 192, 201–06 (1975), and some courts have not followed the trend toward broadly expansive interpretation, *see, e. g., United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979), *submitted for rehearing en banc* April 2, 1980; *United States v. Mandel*, 415 F.Supp. 997, 1020–22 (D.Md.1976) (pretrial order, not alleged as error on appeal); *United States v. Moeller*, 402 F.Supp. 49, 58–61 (D.Conn.1975) (implicitly overruled by *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977)).

Some defendants have challenged the constitutionality of RICO on the grounds of vagueness and double jeopardy, but no court yet has found the Act unconstitutional.[9] Other challenges focus upon the statu-

---

**8.** RICO initially was not very popular among prosecutors. The reluctance to use it no doubt stemmed in part from its complexity and the fear of unleashing a Pandora's box of statutory interpretation problems. Beginning in 1975, the United States Justice Department Task Force specializing in RICO toured the country, lecturing to United States Attorneys and their assistants on the use of RICO. Atkinson, *"Racketeer Influenced and Corrupt Organizations," 18 U.S.C. §§ 1961–68: Broadest of the Federal Criminal Statutes*, 69 J.Crim.L. & Criminology 1, 3 n.21 (1978). After this promotional campaign, RICO has grown in popularity.

Broad interpretation and simplistic resolution of the complicated statutory language pose the danger of enhancing this popularity beyond the intentions of Congress by bringing within the sphere of RICO minor offenses and by intruding on state power.

**9.** *United States v. Campanale*, 518 F.2d 352 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976), was one of the earliest federal appellate decisions rejecting constitutional challenges to RICO. The "enterprises" charged in the indictment against the *Campanale* defendants were the "Vernon Load-

tory definitions of the terms "enterprise" and "pattern of racketeering activity." Questions regarding the latter term have frequently related to defining the relationships necessary between the predicate acts and between the acts and the enterprise. Aside from the *Parness* case, involving the distinction between foreign and domestic corporations, challenges to the scope of the term "enterprise" have generally focused on the questions of whether it includes illegitimate as well as legitimate associations and public as well as private organizations. Defendants Anderson and Mooney argue that the term "enterprise" does not encompass an illegal association that is proved only by facts which also establish the predicate acts constituting the "pattern of racketeering activity." This is the narrow issue we address.[10]

In statutory interpretation we first look to the language of the statute itself. The RICO language is particularly complicated, and the various elements of the offense intricately interrelate. Because we share the general consensus that RICO is a carefully crafted piece of legislation, see *Iannelli v. United States*, 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975), we find that the structural interrelationship of the elements of the offense, as · set forth in the statute, control the disposition of this case. The term "enterprise" must signify an association that is substantially different from the acts which form the "pattern of racketeering activity." A contrary interpretation would alter the essential elements of the offense as determined by Congress.[11]

ing and Unloading Company, Inc., Pronto Loading and Unloading Company, Inc., and Local 626 [a union]." *Id.* at 357 n.11. The court considered the scope of the term "enterprise" only in one sentence wherein it found that "appellants' contentions that the statute does not apply to a small business enterprise such as Pronto is without merit." *Id.* at 364. Nevertheless, courts advocating an expansive definition of the term "enterprise" frequently cite *Campanale* for support. Sometimes the citation is more than misleading as *Campanale* simply cannot be read to stand for the proposition for which it is cited. *E. g., United States v. Aleman, supra*, 609 F.2d at 305 (citing *Campanale* for the proposition that "the term 'enterprise' had a very broad meaning and was not restricted to legitimate business enterprises"); *United States v. Grzywacz, supra*, 603 F.2d at 686 n.6 (citing the holding of *Campanale* as "applied the statute to illegal enterprises, reasoning that a broad interpretation was necessary to achieve the remedial objectives of the enactment"); *United States v. Altese, supra*, 542 F.2d at 107 (citing *Campanale* for the conclusion that illegal enterprises are included).

10. The facts of this case suggest that both Anderson and Mooney might have been charged, as persons employed by Sharp County and Fulton County, respectively, with conducting the affairs of those counties through a pattern of racketeering activity. This formulation of the charge would have avoided the question which we address today, in that the county governments necessarily constitute "enterprises" separate and distinct from the pattern of racketeering activity. Nevertheless, we would still probably be confronted with the issue of defining the scope of the term "enterprise"

because of the unsettled argument that the term cannot encompass government agencies or offices. *See* Atkinson, *supra*, 69 J.Crim.L. & Criminology 1, 13–14 (1978); Bradley, *supra*, 65 Iowa L.Rev. 837, 858–61 (1980). The case as presented for review, however, does not present this issue and therefore we make no comment on its resolution. We note, however that in the recent case of *United States v. Gillock*, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), the defendant was charged with being associated with the enterprise of the Tennessee General Assembly and engaging in the affairs of that enterprise through a pattern of racketeering activity. On appeal from a pretrial suppression of evidence order, the United States Supreme Court appeared to accept the position that the indictment charged violations of federal criminal statutes.

11. At least one court joining the trend of expansive construction of the "enterprise" term has even discarded the generally accepted view that the goal of statutory interpretation is to divine the intent of Congress. In *United States v. Thevis*, 474 F.Supp. 134, 138 (N.D.Ga.1979), the court listed "Congressional intent" as merely one factor to be relied upon in construing a statute and stated that

while Congress may desire that a particular entity be accorded a separate legal status, the Court is not bound by that implied desire. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 176, 2 L.Ed. 60 (1803). The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. *United States v.*

Examining the language of the statute, the Government preliminarily argues that the use of the word "any" in section 1962 prescribes the broadest possible interpretation of the word "enterprise." Congress, however, thought it necessary explicitly to include a definition of the word "enterprise" in section 1961(4). *See United States v. Altese*, 542 F.2d 104, 107 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977) (Van Graafeiland, J., dissenting). Use of the word "any" signifies that all enterprises fitting within this definition can be predicate enterprises for a violation of section 1962 as long as they also have the requisite nexus with interstate or foreign commerce.

The syntactical form of the section 1961(4) definition warrants application of the traditional maxim of statutory construction, *noscitur a sociis*. The definition sets forth two conjunctive phrases, listing the types of groups included in the definition of "enterprise." The first phrase describes legal entities: "individual, partnership, corporation, association, or other legal entity." The second phrase refers to non-legal entities: "any union or group of individuals associated in fact although not a legal entity." In this case, the enterprise charged in the indictment allegedly falls within the category of a "group of individuals associated in fact although not a legal entity." We find that these general words are *ejusdem generis* to the previous words defining types of groups which can constitute an enterprise. The meaning of the general phrase, "group of individuals associ-

ated in fact although not a legal entity," is thus controlled by the preceding specifically enumerated examples.

Although the *ejusdem generis* rule is not applicable when the context of the statutory provision manifests a contrary intention, the wording and composition of RICO, as well as the legislative history and motivating policies of the Act, strongly imply the applicability of the rule. We also must turn to these factors in order to ascertain the pertinent aspects of commonality among the enumerated examples of an enterprise. We first probe more deeply into the statutory language and structure.

Section 1962 divides into four subsections. The first three subsections establish three new offenses.[12] Subsection (a) prohibits investing funds acquired from a pattern of racketeering activity to acquire, establish, or operate an interstate enterprise. Subsection (b) prohibits acquiring or maintaining an interest in an interstate enterprise through a pattern of racketeering activity or through collection of an unlawful debt. Subsection (c), the substantive offense charged against Anderson and Mooney, prohibits any person employed by or associated with an interstate enterprise from conducting the affairs of that enterprise through a pattern of racketeering activity. The last subsection, (d), renders it unlawful to conspire to violate the substantive offenses created in subsections (a), (b), and (c).

Aside from the "enterprise" element, the critical element common to the RICO substantive offenses is the "pattern of racketeering activity."[13] With subsection (c), an

Amer. Trucking Ass'ns, Inc., 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940).

Id. at 138 n.3. Although we acknowledge and accept our duty to determine the meaning of RICO as applied to the controversy before us, we perceive our function as limited to ascertaining the meaning of the statute that Congress intended. Expanding the scope of RICO beyond congressional intent is judicial legislation violative of the separation of powers doctrine established in the United States Constitution.

12. The *Cappetto* court, in establishing the initial precedent for the construction of "enterprise" applied by the Government in this case, distinguished between the use of the term in subsection (a) and its use in subsections (b)

and (c). It acknowledged that subsection (a) was intended "to protect 'legitimate business' against infiltration by racketeers," but concluded that the use of the term "enterprise" in subsections (b) and (c) was not similarly limited. 502 F.2d at 1358. Congress, however, employed the identical term in all three subsections, and defined the term in section 1961 without differentiation according to the provision in which it appeared. Uniform definition thus appears more consistent with legislative intent.

13. With subsections (b) and (c), consideration must also be given to the requirement that the defendant operate "through" a pattern of racketeering activity. This element practically vanishes along with the enterprise element when-

overly broad construction of the term "enterprise" can render that element of the offense interchangeable with the "pattern of racketeering" element. Thus, following the universal rule of construction, expounded in Broom's Legal Maximums 569 * and recognized in *United States v. Menasche,* 348 U.S. 528, 539, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955), that courts should give effect to all the words of a statute in order to discover the true intention of the legislature, the Government's interpretation of the phrase "group of individuals associated in fact" appears contrary to legislative intent.

The definition of "pattern of racketeering activity" provided in section 1961(5) merely "requires at least two acts of racketeering activity." [14] Since the term "racketeering activity" is defined simply by listing particular offenses [15] questions have arisen concerning the nature of the relationship between the two predicate crimes. Although the ordinary and natural meaning of the phrase "pattern of racketeering activity" would seem to require that the predicate acts relate in some manner, section 1961(5)'s requirement of the commission of two of the predicate crimes has been held to be clear on its face, and no further evidence has been held necessary to establish a pattern. *See United States v. Weisman,* 624 F.2d 1118, 27 Cr.L. 2120, 2121 (2d Cir. 1980); *United States v. Rone,* 598 F.2d 564, 571 (9th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Elliott,* 571 F.2d 880, 899 & n.23 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *but see United States v. White,* 386 F.Supp. 882, 883–84 (E.D.Wis.1974). To ensure that the predicate acts possess some degree of interrelationship, some courts have used the "enter-

prise" element to establish a coherent crime by holding that the only relationship between the predicate crimes necessary for a section 1962 violation is that they must both relate to the same enterprise. *See United States v. Weisman, supra; United States v. Elliott, supra.* Thus the "enterprise" element stands as the focal point of the offense.

This use of the "enterprise" element to provide a relationship between the two predicate crimes aids to contain the prohibitions of RICO rather than expand them to cover purely sporadic criminal activity. This result of the statutory structure does not appear serendipitous, but rather seems to be the product of careful planning. *See* McClellan, *Organized Crime Control Act (S. 30) or Its Critics: Which Threaten Civil Liberties?,* 46 Notre Dame Law. 55, 144 (1970). [16]

Elimination of the "enterprise" element of the offense would pose difficult problems relating to the fifth amendment's guarantee against double jeopardy. The "enterprise" element provides an essential ingredient in the constitutionality of the composition and structure of a section 1962(c) offense. Because a defendant may be separately prosecuted for the two predicate crimes, *United States v. Aleman,* 609 F.2d 298, 306 (7th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Rone,* 598 F.2d 564, 571 (9th Cir. 1979) *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980), only by requiring proof of an "enterprise" that engages in or has activities affecting interstate or foreign commerce does section 1962(c) require proof of a fact other than facts required to prove the predicate crimes. [17] *See United States v. Solano,* 605

ever the enterprise is defined as the association to commit the racketeering activity, but it can pose substantive limitations on prosecutorial zeal in the setting of infiltration of legitimate business. *See United States v. Mandel,* 591 F.2d 1347, 1375–76 (4th Cir. 1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Nerone,* 563 F.2d 836, 850–52 (7th Cir. 1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978).

14. *See* note 5, *supra.*

15. *See* note 4, *supra.*

16. Senator McClellan quoted from the Senate Committee's report: "The target of title IX is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern."

17. *But see United States v. Rone, supra,* 598 F.2d at 571, wherein the court conceded that: "If the RICO § 1962(c) charge was based solely on the two extortions, there might be problems

F.2d 1141, 1143–45 (9th Cir. 1979), *cert. denied,* 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980); *United States v. Smith,* 574 F.2d 308, 310–11 (5th Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978).

The definition of "pattern of racketeering activity" can aid construction of the term "enterprise" by examining the nature of the types of offenses chosen by Congress to be listed as "racketeering activity." The offenses chosen reflect an economic orientation, reinforcing the view that Congress intended RICO to aim at the target of organized crime's infiltration of the American economy.

The best explanation for the selection of the particular crimes chosen to serve as predicate acts is provided by Senator McClellan, a co-sponsor of the Act. In a law review article elaborating upon the purpose and coverage of the Organized Crime Control Act, he stated:

> Since the purpose of Title IX is economic, it would be pointless surplusage for it to cover crimes which are not adapted to commercial exploitation. This is why the particular offenses which are well-suited for use to infiltrate a legitimate organization were listed in a section defining one of the substantive elements of Title IX.

McClellan, *supra,* 46 Notre Dame Law. at 161–62 (footnote omitted).

Congress recognized that organized crime, in striving toward financial gain, po-ses a special threat of lawlessness and violence while it undermines the free market system of our economy. As part of the new weapon to combat this problem, Congress designed novel civil remedial provisions. 18 U.S.C. § 1964. These innovations, patterned after the antitrust laws, permit a court to issue civil orders to prevent and restrain violations of section 1962. An analysis of the civil purpose of RICO leads to the conclusion that:

> Title IX is designed to maintain the integrity of business enterprises supplying lawful public needs. Congress may decide eventually to extend the use of civil remedies to combat more indirect economic effects of criminal activity, unrelated to particular business enterprises. But it has not yet done so under Title IX.

Note, *supra,* U.Pa.L.Rev. at 222 (footnote omitted).

The enterprise charged in the Anderson and Mooney indictment assumes that organizations formed solely for illicit purposes and having no legitimate business structure or connection fall within RICO's definition of an enterprise. This permits proof of the enterprise element by evidence indicating a simple association to commit the pattern of racketeering activity. Thus the Fifth Circuit found that RICO has displaced traditional precepts concerning concerted criminal activity, and freed the Government from the strictures of traditional conspiracy doctrine.[18]   *United States v. Elliott,* 571

---

under *Blockburger v. U. S.,* [284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)]." To extricate itself from this dilemma the court found that the Government had also proved three other crimes for which the defendants were not separately penalized, but which could serve as predicate acts pursuant to 18 U.S.C. § 1961(1). Thus the court held that "[t]here is sufficient basis for the § 1962(c) conviction even if the two extortion charges were stricken from the RICO charge." *Id.*

The *Rone* court then proceeded to explain that "[t]he Government is not required to make an election between a conviction under RICO, or prosecuting the predicate crimes only," *id.,* because "Congress clearly intended the Act to provide for new penal prohibitions and enhanced sanctions," *id.* at 572.

One conclusion to be drawn from this type of analysis, when the "enterprise" element is satisfied by showing an association to commit the predicate crimes, is that Congress designed the RICO offenses as a special recidivist type statute. Aside from the double jeopardy conflicts this would entail, we find nothing in the language, structure, or history of the Act to imply that in enacting section 1962(c) Congress was attempting to enhance the punishment of offenders merely because they commit more than one of the predicate crimes. In the Organized Crime Control Act, Congress addressed the subject of recidivism solely in Title X, providing for the treatment of certain persons as special offenders. 18 U.S.C. §§ 3575–3578 (1970). *See also* McClellan, *supra,* 46 Notre Dame Law. at 159–61.

**18.** Professor Bradley summarized the Fifth Circuit's holding thusly:

> The *Elliott* court created two new federal crimes—a subsection 1962(c) RICO violation and a subsection 1962(d) RICO conspiracy—from nothing more than a series of simple

F.2d 880, 900 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). It found that "[t]he 'enterprise conspiracy' is a legislative innovation in the realm of individual liability for group crime." *Id.* at 903. Using this same approach, the Seventh Circuit found that three home robberies could provide the basis for a RICO violation. The enterprise charged was that of a group of individuals associated to commit the robberies, and the defendants conducted the affairs of this enterprise through a pattern of racketeering activity, namely, the commission of the robberies. *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

Congress's inclusion of subsection (d) implies that it did not intend to create a separate species of conspiracy law by including in its definition of the term "enterprise" a "group of individuals associated in fact." It indicates that Congress intended to establish two distinctly separate offenses in subsections (c) and (d). *Cf. United States v. Ohlson*, 552 F.2d 1347, 1349 (9th Cir. 1977) (discussing Wharton's Rule). If a simple criminal conspiracy to commit the predicate crimes were to fulfill the "enterprise" element of a section 1962(c) violation, then a conspiracy to commit a 1962(c) violation would be defined as when a person, associated with a conspiracy to commit criminal acts, conspires to conduct those criminal acts. The awkwardness and duplication inherent in the structure of this articulation of the offense should be sufficient to suggest that we search for an alternate interpretation.

We find nothing in the statutory scheme to suggest that Congress intended to discard the traditional legal precepts applied to concerted criminal activity, or that Congress intended to expand federal jurisdiction to this extent. *See* Bradley, *supra*, 65

Iowa L.Rev. at 878–79; Note, *supra*, 65 Va.L.Rev. 109 (1979). The structure of RICO reveals a specific orientation that does not encompass radical expansion of federal conspiracy law.

In the case at bar, the Government proved the enterprise element of the offense solely by evidence indicating an association to commit the pattern of racketeering activity. This interpretation of the statute effectively eliminated the enterprise element of the offense. We cannot conclude that Congress lightly regarded this element of the offense and intentionally provided for the facile circumvention of the need to prove it. Congress included a separate subsection directed to the prohibition of conspiracy (subsection (d) of 1962) and the indictment separately charged Anderson and Mooney for violating this provision. The difference between being associated with an association to commit a pattern of racketeering activity and an agreement to associate with an association to commit a pattern of racketeering activity is difficult to define. It is unlikely that Congress intended RICO to be this elusive. The statutory language is designed in a complicated manner to address the specific object of its intent. The charge against Anderson and Mooney does not fit within this design.

Congress stated in section 904 of Pub.L. 91–452, 84 Stat. 947 (1970) that RICO "shall be liberally construed to effectuate its remedial purposes." Courts favoring an expansive definition of "enterprise" have placed great reliance on this statement. *See, e. g., United States v. Altese*, 542 F.2d 104, 106 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977). The extent of judicial deference that should be accorded this remark stands unclear. Due process requires that criminal laws be written to give fair notice of the conduct they prohibit.[19] *United States v.*

statutory violations. The element of agreement, necessary to distinguish the conspiracy charge from the substantive offense, is missing. Proof of the substantive offense automatically makes out a conspiracy, according to the court, because one of the elements of the substantive offense, the pattern, satisfies the agreement element of the conspiracy.

Bradley, *supra*, 65 Iowa L.Rev. at 879 (footnote omitted).

19. In *United States v. Sutton* 605 F.2d 260, 266 (6th Cir. 1979), *vacated and submitted for rehearing en banc* April 2, 1980, the majority stated:

In a passage which the government urges us to follow, the Fifth Circuit describes a "criminal enterprise" as "an amoeba-like in-

*Culbert,* 435 U.S. 371, 374, 98 S.Ct. 1112, 1114, 55 L.Ed.2d 349 (1978). Also, the principle of statutory construction, referred to as "the rule of lenity," requires resolving ambiguities in penal statutes in favor of lenity. *Bifulco v. United States,* —— U.S. ——, ——, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971); *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). As the preceding discussion of the language and structure of RICO indicates, the Government simply cannot rely solely on a "plain meaning" interpretation of the term "enterprise." Furthermore, an expansive definition of the term "enterprise" will not necessarily effectuate the remedial purpose of RICO to eliminate the infiltration of racketeers into our business economy. *See* Note, *supra,* 27 De Paul L.Rev. at 97–98. Instead, it will inject federal prosecutors into the realm of offenses traditionally considered to be of a local character.

■ The organization and content of the entire Organized Crime Control Act confirms our conclusion that congressional intent would be thwarted by permitting the "enterprise" element of the offense to be satisfied in the manner charged in the indictment against Anderson and Mooney. "[I]t is an established rule, in construing a statute, that the intention of the lawgiver and the meaning of the law are to be ascertained by viewing the whole and every part of the Act." Broom's Legal Maximus 585 \*. *See also Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

In Title VIII of the Organized Crime Control Act, Congress carefully included provisions designed to preclude infringement upon local law enforcement officials unless the gambling activity could be considered of sufficient magnitude to warrant federal intervention. 18 U.S.C.

§ 1955(b)(1)(ii) and (iii) (1976); McClellan, *supra,* 46 Notre Dame Law. at 138. The creation of the RICO offenses does not reflect any awareness of disruption in the balance between federal and state criminal prosecution, yet an expansive definition of the term "enterprise" permits greater and more pervasive intrusion upon state and local law enforcement authority than would federal entry into the isolated area of gambling. The predicate crimes that can establish a pattern of racketeering activity encompass a broad range of criminal acts, and the effective elimination of the "enterprise" element of the offense would permit federal prosecution of any group of individuals associated to commit two or more predicate acts. Thus, Congress's careful solicitude regarding federal-state relations concerning gambling, evident in Title VIII, would effectively be eradicated by an overly broad construction of Title IX, RICO. *United States v. Altese,* 542 F.2d 104, 109 (2d Cir. 1976), (Van Graafeiland, J., dissenting), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *United States v. Moeller,* 402 F.Supp. 49, 59 (D.Conn.1975); Atkinson, *supra,* 69 J.Crim.L. & Criminology at 6; Note, *supra* 27 De Paul L.Rev. at 100–01. We cannot assume Congress was this careless.

Furthermore, we should be wary of any argument that Congress implicitly altered the traditional division of responsibilities between federal and state governments. In *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971), the Supreme Court pronounced that

> unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. \* \* \* As this Court emphasized only last Term in *Rewis v. United States* [401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493

---

fra-structure that controls a secret criminal network." *United States v. Elliott, supra,* 571 F.2d at 897–98. With all due respect, we think greater precision than that is required if the statute is not to violate "the first essen-

tial of due process of law" by forbidding "the doing of an act in terms so vague that [persons] of common intelligence [would] necessarily [have to] guess at its meaning and differ as to its application.

(1971)], *supra,* we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue the critical matters involved in the judicial decision.

(Footnotes omitted.)

The Government's view of the RICO prosecutions against Anderson and Mooney leads to the conclusion that almost any two criminal acts affecting interstate commerce would fall within the ambit of RICO. Certainly Congress did not silently intend such a drastic reshuffle of the federal-state balance as the expansive theory of the Government would entail.

The relevant legislative history bolsters our interpretation of the definition of a RICO enterprise. Courts reaching a different interpretation of the statute have generally initially determined that the statutory language is unambiguous on its face, and that the plain meaning of the term "enterprise" admits of no exclusions. *See, e. g., United States v. Altese,* 542 F.2d 104, 106 (2d Cir. 1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977) ("clear, precise and unambiguous language"). On this basis, the Government argues that examination of the legislative history is inappropriate. As we have already illustrated, however, only by ignoring the context of the term can it be considered unambiguous.

Most of all courts confronted with defining the scope of RICO have, at least briefly reviewed the legislative history. The House Report on the Organized Crime Control Act notes that "enterprise" includes

"associations in fact, as well as legally recognized associative entities. Thus, infiltration of any associative group by any individual or group capable of holding a property interest can be reached." H.R.Rep.No.91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4007, 4032. The reference to infiltration and the use of the word "entities," which denotes that the association must have an existence that is independent, self-contained, separate and distinct, follow from the general legislative purpose regarding RICO. The pertinent history relating to this purpose can be concisely summarized into three basic categories: (1) broad statements emphasizing the need to curb the growth of racketeering; *e. g., Congressional Statement of Findings and Purpose,* Pub.L. 91–452 § 1, 84 Stat. 922–23 (1970); *see generally* McClellan, *supra;* Wilson, *The Threat of Organized Crime: Highlighting the Challenging New Frontiers in Criminal Law,* 46 Notre Dame Law. 41 (1970); (2) frequent references to the desire to stop the infiltration of legitimate businesses by organized crime and the absence of any reference to any illegitimate association as an enterprise that would be included within the meaning of that term, see examples listed in *United States v. Moeller,* 402 F.Supp. 49, 58–59 n.8 (D.Conn.1975), Note, *supra,* 65 Va.L.Rev. at 116 n.56, and Note, *supra* 124 U.Pa.L.Rev. at 204–05;[20] and (3) congressional sensitivity to intrusion upon state law enforcement authorities.[21]

Obviously, this legislative history does not provide a definitive statement of congressional intent concerning the term "enterprise," but it does help illuminate the intended meaning of the statutory language. It is beyond cavil that the primary purpose

---

**20.** It is impossible to point to any specific congressional refutation of the idea that Title IX applies to illicit businesses. This absence appears to be explained not by congressional uncertainty but by the apparent unanimity of belief that the Act would apply only to infiltration of legitimate business. The Senate Report, the House Report, the Justice Department's recommendation, the concurring view of Senator Scott, the views of the House dissenters, and discussions on the floor of the

Senate and House of Representatives before passage of OCCA–70, clearly express an intent limited to attacking organized crime's incursions into legal enterprises.

Note, *supra,* 124 U.Pa.L.Rev. at 204–05 (footnotes omitted).

**21.** See previous discussion of Congress's sensitivity, in formulating gambling prohibitions in Title VIII, regarding federal intervention into criminal matters of primarily local concern.

of section 1962 was to prevent the infiltration of organized crime into legitimate business enterprises. *Iannelli v. United States*, 420 U.S. 770, 787 n.19, 95 S.Ct. 1284, 1294 n.19, 43 L.Ed.2d 616 (1975). While legislators recognized that activities not necessarily conducted by organized crime would fall within the proscriptions of the statute, they formulated the statute thusly because of the constraints inherent in defining the prohibited conduct. *See* McClellan, *supra*, 46 Notre Dame Law. at 142–43. Nevertheless, they remained sensitive to local law enforcement interests, and took care to limit federal intrusion into areas traditionally left to local law enforcement.

The motivating policy of the Act, to free our nation's economic system from the tentacles of organized crime, does not even suggest that Congress intended the definition of an enterprise to encompass a simple association to commit the predicate crimes constituting the pattern of racketeering activity. An expansive definition of the enterprise element of the offense grossly disrupts the balance between federal and state law enforcement efforts, and brings within the ambit of the statute offenses which Congress did not consider sufficiently threatening to our economy to warrant federal intervention. Indeed, the primary purpose of RICO could be displaced. There is no indication that Congress ever intended to grant federal prosecutors the flexibility to pursue relatively minor offenders, having no connection with organized crime, who simply associate to commit two of the predicate crimes.

■ We hold that Congress intended that the phrase "a group of individuals associated in fact although not a legal entity," as used in its definition of the term "enterprise" in section 1961(4), to encompass only an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that

can be defined apart from the commission of the predicate acts constituting the "pattern of racketeering activity."

We recognize that this holding places the Eighth Circuit in direct opposition to the views of the Second, Fifth, Seventh, and Ninth Circuits. *See United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Although the District of Columbia Circuit has not had occasion to address the possible overbreadth of RICO, in *United States v. Swiderski*, 593 F.2d 1246, 1248–49 (D.C.Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979), a panel of that circuit indicated that it would be inclined to adopt the position of broad construction. The Third Circuit has also not directly addressed the issue before us. Although it has indicated concurrence with a broad view of the statute in a different context, *United States v. Frumento*, 563 F.2d 1083, 1089–91 (3d Cir. 1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), its position is not inconsistent with our holding today.[22] The Sixth Circuit is at this writing our sole declared ally. In *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979), *vacated and submitted for rehearing en banc* April 2, 1980, a panel of that court held that the term "enterprise" encompasses only legitimate associations. We differ from this holding only to the extent that we do not rest our holding on the word "legitimate" but rather on the need for a discrete economic association existing separately from the racketeering activity. *See* Bradley, *supra*, 65 Iowa L.Rev. at 854–55.

22. The Third Circuit in *Frumento* held that a government agency (Pennsylvania Bureau of Cigarette and Beverage Taxes) falls within RICO's definition of enterprise. 563 F.2d at 1089–91. In *United States v. Sisk*, 476 F.Supp. 1061 (M.D.Tenn.1979), Judge Merritt, who

wrote the *Sutton* majority panel opinion for the Sixth Circuit, found that the enterprise coverage of the statute is not limited to private institutions but also includes governmental agencies, thus adopting the position of the Third Circuit in *Frumento*.

## III. *Denial of Motion for Severance of Trial*

Defendants contend that reversal of their convictions on the RICO counts would remove any conceivable justification for a joint trial, and render the District Court's denial of their motion for severance an abuse of discretion. This argument is not persuasive.

█ Federal Rule of Criminal Procedure 8(b) provides for consolidation of the proceedings if the defendants were participants "in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Aside from the RICO counts, Anderson and Mooney were jointly indicted in Counts XVI, XVII, XIX, XXI, and XXIII. The bogus voucher scheme charged in the indictment was the basis for all the charges against the defendants and indicates that both defendants participated in a closely related series of acts or transactions. It is not necessary that each defendant participated in each act or transaction. *United States v. Wofford*, 562 F.2d 582, 585 (8th Cir. 1977), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978).

█ Defendant Mooney argues that he was entitled to a separate trial because of Anderson's felony conviction. He asserts that it was unfair to join him in the mind of the jury with a convicted felon. Separate trials, however, are not necessary simply because the evidence may be more damaging against one of the defendants. *United States v. Williams*, 604 F.2d 1102, 1119 (8th Cir. 1979); *United States v. Fuel*, 583 F.2d 978, 987 (8th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). Furthermore, the trial court carefully instructed upon the duty to give separate, personal consideration to the case of each individual defendant.

█ A motion to sever rests within the sound discretion of the trial court, and its judgment will not be reversed absent a showing of clear prejudice indicating an abuse of discretion. *United States v. Brown*, 605 F.2d 389, 393 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979); *United States v. Runge*, 593 F.2d 66, 73 (8th Cir.), *cert. denied*, 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979); *United States v. Williams*, 604 F.2d 1102, 1119 (8th Cir. 1979). A careful review of the record reveals no prejudice from the joint trial procedure amounting to an abuse of discretion.

## IV. *Evidence of Anderson's Felony Conviction*

During trial, the Government's key witness, Paul Baldwin, while testifying about an agreement with Anderson and Mooney regarding the bogus sale of pipe, stated that Anderson had said that he needed money in order to appeal a recent conviction. Defendants argue that this evidence was inadmissible and prejudiced Anderson by placing his character in issue. Furthermore, they argue that, even if admissible, the court erred by not properly instructing the jury regarding its limited application.

> Federal Rule of Evidence 404(b) provides: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The Government argues that evidence that Anderson needed money to pay for an appeal of a criminal conviction is highly probative of motive, intent, plan, or scheme, and that the evidence completes the story of the transaction alleged in the indictment. The District Court properly recognized the relevance of this information and during the trial instructed the jury accordingly. The trial court also properly exercised its discretion by determining that the prejudicial effect of this evidence did not outweigh its probative value. The evidence was presented in a manner clearly related to explaining the defendants' scheme of conduct. *See United States v. Brown*, 605 F.2d 389, 394 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979); *United States v. McMillian*, 535 F.2d 1035, 1039 (8th Cir. 1976), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978).

■ Defendants complain that the court did not offer a limiting instruction at the close of the case, and argue that the instructions made during the case were not sufficient to establish the limited purpose of the testimony. We find that the cautionary instructions given properly restricted the consideration of the evidence. Further, we note that, since neither defendant offered an instruction at the close of the case nor objected to the absence of one, it may not now be assigned as error. Fed.R.Crim.P. 30.

### V. *Voir Dire*

The morning before trial, defendants filed a motion requesting the Government to identify each of its prospective witnesses for the jury, in order to ask if anyone might know or have knowledge about the prospective witnesses. The Government responded that if the court granted this request the same should be required of defendants. The court then required both sides to read their lists of prospective witnesses during the voir dire in order to query jurors regarding their impartiality.

The form and scope of voir dire examination rests primarily in the discretion of the district court, and will constitute error only if an abuse of discretion results in substantial prejudice to the defendant. *United States v. Lewis*, 547 F.2d 1030, 1036 (8th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977). Defendants argue that they were prejudiced by implanting the expectation of the appearance of those witnesses in the minds of the jurors, effectively compelling defendants to present a defense, rather than rest after the Government's case.

■ Although a better practice would be for the court to read the list of prospective witnesses without identifying whether they may appear on behalf of the prosecution or the defense, we do not perceive that defendants have suffered substantial prejudice in this case. The question of whether any of the jurors are acquainted with the prospective witnesses is clearly important to the question of the jurors' impartiality. *See United States v. Baldwin*, 607 F.2d 1295, 1297–98 (9th Cir. 1979); *United States*

*v. Jackson*, 508 F.2d 1001, 1005–08 (7th Cir. 1975). There is no suggestion that the Government took any advantage by discovering the names of the defense witnesses before they were to testify, and a reading of the record clearly implies that defendants' decisions to testify were motivated by the overwhelming evidence presented by the prosecution.

Defendants also contend that the court abused its discretion in the juror selection process by excusing a prospective juror who was a student scheduled to move into his dormitory on August 16 and begin school on August 19, and by refusing to strike for cause the wife of a maintenance man who worked for the Postal Service. Neither of these actions constituted an abuse of discretion.

■ "Rulings on juror qualifications will not be interfered with on appeal absent a clear showing of abuse of the sound discretion that is vested in the District Court." *United States v. Young*, 553 F.2d 1132, 1136 (8th Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 278 (1977). The trial commenced on August 13, and the parties estimated that it would take approximately one week to try. Excusing the student cannot possibly be considered an abuse of discretion. The wife of the Postal Service employee, after careful questioning, did not indicate any prejudice or bias. "Unless actual bias is shown the Court's refusal to strike potential jurors will not be deemed a basis for error." *Id.* The implication that her association with the Postal Service would prejudice her in a case charging mail fraud was tenuous, and the District Court did not err in rejecting the presumption of implied bias.

### VI. *Venue*

■ Lastly, the defendants argue that, in determining venue within a district, the trial court did not exercise proper discretion because it gave insufficient regard to the convenience of the defendants and their witnesses.

Federal Rule of Criminal Procedure 18 requires that in determining the place and

prosecution of a criminal trial, the court must give "due regard to the convenience of the defendant and the witnesses." Absent any prejudice to the defense, the decision of the trial court cannot be considered an abuse of discretion. *See United States v. Thiel*, 619 F.2d 778 at 780 (8th Cir. 1980). Although defendants challenge the reasons for denying their motion for change of venue, they do not indicate any manner in which they were prejudiced. The denial of their motion to transfer cannot be considered an abuse of discretion.

### VII. *Conclusion*

The convictions of Anderson and Mooney on Counts I and II of the indictment, charging violations of RICO, are reversed. Defendants' remaining challenges are rejected and their convictions on the remaining counts are affirmed.